LEE v. ATLANTIC COAST LINE R. CO. DUNNING v. SAME. MYERS v. SAME. ENTER v. SAME.

(Circuit Court, D. South Carolina. December 23, 1906.)

1. RAILROADS—CONSOLIDATION—DISTINCTION BETWEEN CONSOLIDATION AND MERGER.

There is a distinct difference between a consolidation and a merger of two railroad companies. In a consolidation, both go out of existence as separate corporations, and a new corporation is created, which takes their place and property; while in case of a merger one loses its identity by absorption in the other, which remains in existence, and succeeds to its property, and issues its own stock to the stockholders of the merged company.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Railroads, §§ 443–455.]

2. SAME—MERGER.

The Atlantic Coast Line Railroad Company, incorporated in Virginia and having its principal offices in Richmond, with power given by its charter to "consolidate with itself" other corporations, entered into an agreement of "consolidation and merger" with a company owning connecting lines, incorporated in other states, which agreement provided that the stock of the second company should be retired and canceled, and stock of the Coast Line Company issued in its place; that all the stock, property, and franchises of both should be merged, united, and consolidated, "so as to form a merged, united and consolidated company"; that "said merger, union, and consolidation shall be into the Atlantic Coast Line Railroad Company, which is to continue the name of the consolidated company"; and that its office should remain in Richmond. Under such

agreement the stock of the second company was canceled, but stock pre-
viously issued by the Coast Line Company remained outstanding, and such
company took charge of and operated all lines previously owned and
operated by either company, without any change in its management or
control. Held, that such agreement effected a merger, and not a consoli-
dation, and that the Coast Line Company continued to exist as a Virginia
corporation.

8. REMOVAL OF CAUSES—CITIZENSHIP OF CORPORATION—EFFECT OF REINCOR-
PORATING IN ANOTHER STATE.
    Under Code of Laws, S. C. 1902, § 2050 et seq., which authorize either
the merger or consolidation of a railroad company of the state with
another company of the state or of another state when domesticated in the
state, and, in case of consolidation, the issuing of a certificate or charter
to the consolidated company, where a union of two such companies is by
merger, instead of consolidation, by virtue of which a corporation of an-
other state absorbs and acquires the property of the other, such corpora-
tion does not, by applying for and obtaining a certificate or charter of
consolidation, become a citizen of South Carolina for the purposes of the
jurisdiction of a federal court, but remains a citizen of the state in which
it was originally incorporated, although the effect is to make it a do-
mestic corporation of the state for other purposes.

4. SAME—CORPORATIONS—ALLEGATION OF CITIZENSHIP.
    Where a corporation defendant in a petition for removal alleges that it
was organized under the laws of a state other than that in which it is
sued, an allegation that it is not a citizen of the latter state is unneces-
sary.

On Motions to Remand to State Court.

W. A. Holman, Howell & Gruber, J. P. K. Bryan, and W. Turner
Logan, for plaintiffs.

T. M. Mordecai, W. Huger Fitzsimmons, David Bell, Willcox &
Willcox, and H. E. Davis, for defendant.

PRITCHARD, Circuit Judge. This is a motion to remand to the
state court and is based upon an allegation that the defendant company
is a citizen of the state of South Carolina. The report of the referee
contains a full and complete statement of all the facts leading up to
the incorporation of what is known as the "Atlantic Coast Line Rail-
road Company," defendant in the above-entitled actions. The report is
as follows:

(1) That the General Assembly of the state of Virginia at its session of 1835-
36, by an act passed March 14, 1836 (Acts 1835-36, p. 146, c. 121), chartered a
corporation by the name of the "Richmond & Petersburg Railroad Company,"
and under the provisions of that act the incorporators therein named duly
organized and constructed and operated a line of railroad.

(2) That after the organization of said corporation the General Assembly
of Virginia from time to time passed acts empowering it to borrow money and
to issue bonds, and on the 16th day of January, 1867, passed an act (Acts
1866-67, p. 537, c. 74) authorizing it to extend its track through the city of
Petersburg, so as to connect with the Petersburg Railroad Company, which
corporation had been organized some time prior thereto.

(3) On the 1st day of March, 1898, the General Assembly of Virginia passed
an act entitled "An act to authorize the consolidation of the Richmond &
Petersburg Railroad Company and the Petersburg Railroad Company, and to
authorize the consolidated company to change its name to the Atlantic Coast
Line Railroad Company of Virginia" (Acts 1897-98, p. 674, c. 635), and by
virtue of such authority the Petersburg Railroad Company, by deed of bar-
gain and sale, conveyed all of its property, rights, and franchises to the Rich-

mond & Petersburg Railroad Company, and the name of the Richmond & Petersburg Railroad Company was by subsequent action of the stockholders changed to Atlantic Coast Line Railroad Company of Virginia; the Richmond & Petersburg Railroad Company and the Petersburg Railroad Company ceasing to exist as separate corporations.

(4) That prior to the 18th day of July, 1898, there had been created by and organized under the laws of the state of South Carolina, as South Carolina corporations, the Wilmington, Columbia & Augusta Railroad Company, the Cheraw & Darlington Railroad Company, the Northeastern Railroad Company, the Manchester & Augusta Railroad Company, and the Florence Railroad Company; and by an act of the General Assembly of South Carolina approved the 5th day of March, 1897 (22 St. at Large, p. 653), the said companies were permitted to consolidate and become one company under the name of the Atlantic Coast Line Railroad Company of South Carolina; and on the said 18th day of July, 1898, the Atlantic Coast Line Railroad Company of South Carolina having been duly organized under the authority of said act, the said Wilmington, Columbia & Augusta Railroad Company, the Northeastern Railroad Company, the Manchester & Augusta Railroad Company, the Cheraw Railroad Company, and the Florence Railroad Company did by deed of bargain and sale convey all of their property, rights, and franchises to the Atlantic Coast Line Railroad Company of South Carolina; and after said conveyance the said Wilmington, Columbia & Augusta Railroad Company, the Northeastern Railroad Company, the Manchester & Augusta Railroad Company, the Cheraw & Darlington Railroad Company, and the Florence Railroad Company ceased to exist as separate corporations, and ceased to exercise any corporate functions under their respective charters, and all their rights, properties, and franchises became vested in and were operated and controlled by the Atlantic Coast Line Company of South Carolina.

(5) Under the provision of the general law of South Carolina any railroad company organized under the laws of that state, and operating a railroad either wholly or partly within or partly without that state, is authorized to merge and consolidate its capital stock, franchises, and property with those of any other railroad company organized or operated under the laws of that state or any other state, whenever the companies proposing to be consolidated shall form a continuous line of railroads, either with each other or by means of an intervening railroad. See Rev. St. S. C. 1893, art. 3, c. 51.

(6) That the line of railroad operated by the Atlantic Coast Line Railroad Company of Virginia connected with the line of railroad owned and operated by the Wilmington & Weldon Railroad Company in the state of North Carolina, and the line of railroad owned and operated by the Wilmington & Weldon Railroad Company connected with the line of railroads owned and operated by the Atlantic Coast Line Railroad Company of South Carolina, so that the line of railroad of the Atlantic Coast Line Railroad Company of Virginia, and the Atlantic Coast Line Company of South Carolina formed a continuous line of railroad by means of the intervening line of the Wilmington & Weldon Railroad Company of North Carolina.

(7) On the 12th day of January, 1900, the General Assembly of Virginia passed an act (Acts 1899–1900, p. 24, c. 18) by which it authorized the Atlantic Coast Line Railroad Company of Virginia to change its name, to increase the number of its stockholders and officers, to increase its capital stock, and to issue bonds secured by one or more mortgages, and further authorized it to lease and consolidate with itself other corporations, and otherwise enlarge the powers of the said Atlantic Coast Line Railroad Company of Virginia; and thereafter, to wit, on the 18th day of April, 1900, the said Atlantic Coast Line Railroad Company of Virginia, by a deed of bargain and sale dated on that date, became the owner of the respective property and franchises of the Norfolk & Carolina Railroad Company, a corporation of the states of Virginia and North Carolina, the Wilmington & Weldon Railroad Company, a corporation of North Carolina, the Southeastern Railroad Company, a corporation of North Carolina, and the Atlantic Coast Line Railroad Company of South Carolina, a corporation of that state; and, after the execution of this deed by them to the Atlantic Coast Line Railroad Company of Virginia, the said Nor-

folk & Carolina Railroad Company, the Wilmington & Weldon Railroad Company, the Southeastern Railroad Company, and the Atlantic Coast Line Railroad Company of South Carolina ceased to exist or to operate any of their corporate powers and functions, and all of their rights, properties, and franchises became vested in and were controlled by the Atlantic Coast Line Railroad Company of Virginia, and the deed executed to it was, in compliance with the requirements of the law of the state of South Carolina, duly recorded in the offices of the Secretary of State and the clerks of the court and other recording offices of the counties through which the lines acquired by the Atlantic Coast Line Railroad Company of Virginia ran.

(8) The General Assembly of South Carolina on the 9th of March, 1896, passed an act (22 St. at Large, p. 114), entitled "An act to approve the manner in which railroad companies incorporated under the laws of other states or countries may become incorporated in this state," which act provided "that each and every railroad company or railroad corporation created or organized under and by virtue of any government other than that of this state, desiring to own or carry on business or exercise any corporate functions in this state, of any kind whatsoever, shall first file in the office of the Secretary of State a copy of its charter, paying therefor such fees as may be required by law, and cause a copy of such charter to be recorded in the office of the register of mesne conveyance or clerk of court of common pleas in each county in which said company or corporation desires or proposes to carry on its business or to acquire or own property"; and in accordance with this act a duly authenticated copy of the charter of the Atlantic Coast Line Railroad Company of Virginia was filed in the office of the Secretary of State of South Carolina on the 16th day of April, 1900, and a duly authenticated copy of said charter was recorded in the office of the registrar of mesne conveyance or clerk of the court of the respective counties in which the Atlantic Coast Line Railroad Company of Virginia proposed to carry on business or to acquire or own property in the state of South Carolina.

(9) That subsequent to the execution of the deed of indenture dated the 18th day of April, 1900, and referred to in paragraph 7 of these findings of fact, the Atlantic Coast Line Railroad Company of Virginia, having been authorized so to do by the amendment to its charter passed by the General Assembly of Virginia and approved January 12, 1900, by a vote of the majority of its stockholders changed its name from the Atlantic Coast Line Company of Virginia to the Atlantic Coast Line Railroad Company; and from that time on the last-named company, the Atlantic Coast Line Railroad Company, as the successor of the Atlantic Coast Line Railroad Company of Virginia, by the change of name aforesaid, owned, controlled, and operated the properties and franchises formerly belonging to and operated by the Atlantic Coast Line Railroad Company of South Carolina and the other companies which had conveyed to the Atlantic Coast Line Railroad Company of Virginia—stock of the said Atlantic Coast Line Railroad Company of South Carolina being retired and canceled, and stock of the new company issued in exchange therefor.

(10) That prior to the 10th day of May, 1901, the Charleston & Savannah Railroad Company was a corporation existing under the laws of the states of South Carolina and Georgia, the Brunswick & Western Railroad Company was a corporation existing under the laws of the state of Georgia, the Alabama Midland Railroad Company was a corporation existing under the laws of the states of Georgia and Alabama, the Silver Springs, Ocala & Gulf Railroad Company was a corporation existing under the laws of the state of Florida, the Tampa & Thonotossa Railroad Company was a corporation existing under the laws of the state of Florida, and the Savannah, Florida & Western Railway Company was a corporation existing under the laws of the states of Florida and Georgia. On that date, to wit, the 10th day of May, 1901, these several companies entered into a joint agreement, pursuant to the laws of the different states in which they were incorporated, whereby all of them were consolidated and merged, and all their rights, property, and franchises, by operation of law, vested in the Savannah, Florida & Western Railroad Company. By this instrument the corporations above named "merged, united, and consolidated, all and singular, their respective capital stocks, estates, privileges,

immunities, franchises, and properties, of every nature and kind whatsoever and wheresoever situated, so as to form a merged, united, and consolidated company, to have, hold, possess, and enjoy all and singular said estates, rights, assets, privileges, immunities, franchises, and property, of every nature and kind whatsoever and wheresoever situate, at the date of these presents and at the date of the consummation of this merger, union, and consolidation held, possessed, or enjoyed by said companies parties hereto, or any of them, or to which they, or any of them, are or may hereafter be entitled, either at law or in equity." Under the terms of this agreement, stock of the several companies forming the merger was to be retired, and stock of the Savannah, Florida, & Western Railway Company issued therefor. This agreement was duly submitted to the stockholders of the Charleston & Savannah Railroad Company and the other companies, was accepted by them, and the exchange of stock made; and after that time the Savannah, Florida & Western Railway Company operated all the lines that had been theretofore operated by the corporations who were parties to the merger agreement. The Charleston & Savannah Railroad Company ceased to do business, to hold meetings, or to perform any of its corporate functions; and in accordance with the requirements of the law of South Carolina the consolidated company asked for a charter or certificate of consolidation from that state, and this was issued to the Plant Investment Company and others on the 10th day of July, 1901. 23 St. at Large, S. C. p. 1308.

(11) That prior to the 12th day of July, 1901, the Ashley River Railroad Company and the Greenpond, Walterboro & Branchville Railroad Company were corporations duly organized and existing under the laws of the state of South Carolina, the Abbeville Southern Railway Company and the Southwestern Alabama Railway Company were corporations duly organized and existing under the laws of the state of Alabama, and on that date, to wit, the 12th day of July, 1901, the corporations above named entered into articles of agreement and consolidation with the Savannah, Florida & Western Railway Company, by which all of the property, estates, rights, privileges, and franchises of said companies were merged into and became the property of the Savannah, Florida & Western Railway Company; and by the terms of the consolidation the stock of the said Ashley River Railroad Company, Greenpond, Walterboro & Branchville Railroad Company, and the Southwestern Alabama Railway Company was taken up and canceled, and stock of the merged and consolidated company issued therefor, and these corporations ceased to do business, held no meetings, and performed no corporate functions; and thereafter the Savannah, Florida & Western Railway Company alone owned, operated, and controlled the lines of the railroad which had formerly been owned and operated by the said companies; and in accordance with the requirements of the South Carolina law the consolidated company applied for a charter or certificate of consolidation from that state, and this was issued to the Plant Investment Company and others on the 12th day of October, 1901. 23 St. at Large, S. C. p. 1309.

(12) On April 10, 1902, the Atlantic Coast Line Railroad Company, which was, by virtue of the change of name and the acts of the General Assembly of the state of Virginia as hereinbefore found, a successor to the Atlantic Coast Line Railroad Company of Virginia, and which, by reason of the deeds of conveyance hereinbefore mentioned, owned and operated the lines of railroad formerly belonging to the Atlantic Coast Line Railroad Company of Virginia, the Wilmington & Weldon Railroad Company, and the Atlantic Coast Line Railroad Company of South Carolina, and which, by filing and recording its charter as required by the statute law of South Carolina, was authorized to do business in that state, entered into an agreement of consolidation and merger with the Savannah, Florida & Western Railway Company. In this agreement it is recited that the Atlantic Coast Line Railroad Company is a corporation duly incorporated and existing under the laws of the state of Virginia, and also duly established and existing under the laws of the states of North Carolina and South Carolina, and is the owner of a line of railway extending from Richmond, Va., to Charleston, S. C. By this agreement it was provided that the stock of the Savannah, Florida & Western

Railway Company should be retired, and canceled, and stock of the Atlantic Coast Line Railroad Company issued therefor. It was further provided that said "Savannah, Florida & Western Railway Company, and all of its capital stock, property, and franchises, are hereby merged, united, and consolidated with said Atlantic Coast Line Railroad Company, and its capital stock, property, and franchises, so as to form a merged, united, and consolidated company, which will have, hold, possess, and enjoy all and singular the capital stocks, property, and franchises, of every kind whatsoever and wheresoever situated, at the date of these presents and at the date of the consummation of this merger, union, and consolidation, held, possessed, or enjoyed by either of the parties hereto, or to which they are, or either of them is, or may hereafter be, entitled either at law or in equity, and that said merger, union, and consolidation shall be into the Atlantic Coast Line Railroad Company, which is to continue the name of the consolidated company; and the principal office or place of business of the Atlantic Coast Line Railroad Company in the city of Richmond, Va., shall continue to be the principal office or place of business of the consolidated company; and this agreement was duly submitted to and ratified by the stockholders of the Savannah, Florida & Western Railway Company, thereafter the stock of the Savannah, Florida & Western Railway Company being retired and canceled, and that company ceasing to exist and do business, to hold stockholders' or directors' meetings, elect officers, or perform any other corporate function; and the line of railroad thereafter operated by it passed under the control and management of the Atlantic Coast Line Railroad Company, and has ever since been operated, controlled, and managed by it.

(13) In 1902 the General Assembly of South Carolina passed an act as follows: "That each and every railroad company created or organized under and by virtue of the laws of any government or state other than this state, and now operating any railroad in this state, either as the owners thereof or otherwise, or carrying on any business or exercising any corporate franchise in this state, shall, on or before the 1st day of January, 1902, apply for a charter of incorporation under the laws of this state in the manner directed in section 1 of this act, and no such railroad shall carry on business, exercise any corporate franchise in this state after the said date without having complied with the provisions of this act." 23 St. at Large, p. 1053, § 2.

(14) That thereafter, at a meeting of the stockholders of the Atlantic Coast Line Railroad Company, held in the city of Richmond, Va., May 12, 1902, it was resolved that the state of South Carolina be requested to issue to Henry Walters, Warren G. Elliott, James J. Lucas, and Christopher S. Gadsden, and such other persons as now may be, or hereafter may become, associated with them as the owners and stockholders of the merged, united, and consolidated company, and their successors, a charter as a merged, united, and consolidated body politic and corporate in perpetuity, under the name of the "Atlantic Coast Line Railroad Company," etc.; and subsequently, to wit, on the 13th day of May, 1902, such a certificate of consolidation was granted by the state of South Carolina to the persons named in the resolution, in accordance with the act above referred to and in compliance with chapter 50, art. 3, § 2050 et seq., of the Civil Code of 1902 of South Carolina, known as the "Consolidation Act" of that state.

(15) That no other use was made of this charter by the incorporators named therein, and there was no organization under the same.

(16) That at the time the above causes of action arose, and at the times mentioned in the several complaints filed therein, the Atlantic Coast Line Railroad Company, as the successor of the Atlantic Coast Line Railroad Company of Virginia, and originally deriving its corporate existence from the state of Virginia, was, and is now, by virtue of the consolidation agreements and deeds hereinbefore referred to, the owner of the lines of railroad upon which the injuries for which these suits are brought occurred, and was and is now operating and managing said lines of railroad and doing business in the state of South Carolina, by virtue of its compliance with the laws of that state as hereinbefore set forth.

In paragraph 12 of the referee's report it is shown that in pursuance of the different acts of the Legislature of Virginia the Atlantic Coast Line Railroad Company of Virginia was granted permission to change its name, increase the number of its directors, and also increase its capital stock, and to issue bonds and secure the same by one or more mortgages, and the statute in question authorized the leasing by it and the consolidation therewith of other corporations and the enlargement of its powers. It also appears that, in pursuance of the authority granted by the Legislature of Virginia, the Atlantic Coast Line Railroad of Virginia changed its name to that of the "Atlantic Coast Line Railroad Company." The report further shows that the parent company, as well as its predecessor, the Atlantic Coast Line Railroad Company, was organized in accordance with the laws of Virginia, and that its directors and managers are citizens of, and its principal office is located in, that state. It also appears that various lines of railroad which it now owns and controls were purchased in accordance with the laws of Virginia, North Carolina, and South Carolina, and transferred by deeds of conveyance dated on the 18th of April, 1900, and July 18, 1898, respectively, and that the stock of each of the corporations theretofore owning and controlling the respective lines of railroad thus purchased had been surrendered and canceled, and in lieu thereof the Atlantic Coast Line Railroad Company, the Virginia corporation heretofore referred to, has issued its stock in payment for the same, and all of the property and franchises of said lines of railroad were sold and delivered to the Atlantic Coast Line Railroad Company for a valuable consideration. By the deeds of conveyance from the several companies to the Atlantic Coast Line Railroad Company all the right, title, and interest of these companies, of whatsoever character, was completely merged into the defendant company, and as a result these companies have ceased to exist as separate and distinct entities.

The instruments by which the property and franchises of the various local corporations were conveyed to the Atlantic Coast Line Railroad Company are what might be properly designated as deeds in fee simple, by the terms of which the foreign corporation created under the laws of Virginia acquired title to all of the property, rights, and franchises which had been owned and possessed by such companies while operating under the charters which had been granted by the states of North and South Carolina. These deeds contain no exceptions or reservations, and are deeds of conveyance in every sense of the word. In some instances the parties holding stock in the local corporations received cash in payment for the stock of the Atlantic Coast Line Railroad Company, which was issued in pursuance of the authority vested in such corporation by the Legislature of the state which authorized its creation. The Charleston & Savannah Railroad Company, a Georgia and South Carolina corporation; the Brunswick & Western Railroad Company, a corporation under the laws of Georgia; the Alabama Midland Railroad Company, a corporation under the laws of Alabama and Georgia; the Silver Springs, Ocala & Gulf Railroad Company, a corporation created under the laws of Florida; the Tampa & Thonotossa Railroad Company, a Florida corporation; and the Savannah, Florida & Western

Railway Company, created and existing under the laws of the states
of Florida and Georgia—in pursuance of the laws of the several states
under which these corporations were created, entered into a joint
agreement on the 10th day of May, 1901, whereby all of these com-
panies consolidated and merged, and by such agreement the rights,
property, and franchises, of whatsoever character, were consolidated
and merged into the Savannah, Florida & Western Railway Company,
and by this agreement the corporations hereinbefore mentioned—

"Merged, united, and consolidated all and singular their respective capital
stocks, estates, privileges, immunities, franchises, and properties, of every na-
ture and kind whatsoever and wheresoever situated, so as to form a merged,
united, and consolidated company, to have and to hold, possess, and enjoy all
and singular said estates, rights, assets, privileges, immunities, franchises, and
property of every nature and kind, whatsoever and wheresoever situated, at
the date of these presents and at the date of the consummation of this merger,
union, and consolidation held, possessed, or enjoyed by said companies, parties
hereto, or any of them, or to which they, or any of them, are, or may hereaft-
er be entitled, either at law or in equity."

It appears from the report of the referee that all of the companies
thus consolidated and merged into the Savannah, Florida & Western
Railway Company ceased to do business on and after the date of
such consolidation and merger, and the consolidated company asked for
a certificate of charter of consolidation, and this was issued on the 10th
day of July, 1901, to the Plant Investment Company, Robert G. Erwin,
and Franklin Q. Brown, and "such other persons as might thereafter
become associated with them," as the owners and stockholders of the
merged, united, and consolidated company and their successors—a
charter as a merged, united, and consolidated body politic and corporate
in perpetuity and in the name of the Savannah, Florida & Western
Railway Company. 23 St. at Large, S. C., p. 1308. It also appears that
the Ashley River Railroad Company and the Greenpond, Walterboro
& Branchville Railroad Company, created and existing under the laws
of the state of South Carolina, and the Abbeville Southern Railway
Company and the Southwestern Alabama Railway Company, corpora-
tions under the laws of the state of Alabama, entered into articles of
agreement and consolidation on the 12th of July, 1901, with the Savan-
nah, Florida & Western Railway Company, by which all of the prop-
erties, estates, rights, privileges, and franchises of the said companies
were merged into and became the property of the Savannah, Florida
& Western Railway Company, and by the terms of the consolidation
and merger the companies thus merged into the Savannah, Florida &
Western Railway Company surrendered and canceled all of the stock
belonging to the same, and the stock of the merged and consolidated
company was issued therefor, and such corporations ceased to do
business from that date, and it further appears from the record that said
companies held no meetings and performed no corporate functions
from such date, and that thereafter the Savannah, Florida & Western
Railway Company owned, operated, and controlled all of the lines
which had theretofore been owned, operated, and controlled by such
companies; and in accordance with the requirements of the laws of
South Carolina the consolidated company on the 12th day of October,
1901, applied for a charter or certificate of consolidation from that

state, and such certificate was issued to the Plant Investment Company, Robert G. Erwin, and Franklin Q. Brown, and such other persons as then or might thereafter become associated with them, "as the owners and stockholders of the merged, united, and consolidated company and their successors—a charter as a merged, united, and consolidated body politic and corporate in perpetuity into and under the name of the Savannah, Florida & Western Railway Company." 23 St. at Large, S. C., p. 1310.

The Atlantic Coast Line Railroad Company, the successor of the Atlantic Coast Line Railroad Company of Virginia, a corporation created under the laws of that state, having acquired the property, rights, franchises, etc., of the Wilmington & Weldon Railroad Company and the Atlantic Coast Line Railroad Company of South Carolina, which by filing and recording its charter as required by the statute of South Carolina was authorized to do business in that state, and as such had owned and operated such lines from the date of the deeds conveying such property to it, and on April 10, 1902, entered into an agreement of consolidation and merger with the Savannah, Florida & Western Railway Company. In this agreement it is stated that the Atlantic Coast Line Railway Company is a corporation incorporated and existing under the laws of the state of Virginia, and also duly established and existing under the laws of the states of North Carolina and South Carolina, and that the line of railway owned by it extends from Richmond, Va., to Charleston, S. C. In this agreement it was also provided that the stock of the Savannah, Florida & Western Railway Company should be retired and canceled, and the stock of the Atlantic Coast Line Railroad Company, a Virginia corporation, should be issued therefor. It was further provided that:

"The Savannah, Florida & Western Railway Company, and all of its capital stock, property, and franchises are hereby merged, united, and consolidated with said Atlantic Coast Line Railroad Company and its capital stock, property, and franchises, so as to form a merged, united, and consolidated company which will have, hold, possess, and enjoy all and singular the capital stocks, property, and franchises, of every kind whatsoever 'and wheresoever situated, at the date of these presents and at the date of the consummation of this merger, union, and consolidation held, possessed, or enjoyed by either of the parties hereto. or to which they are, or either of them is, or may hereafter be, entitled either at law or in equity; * * * and said merger, union, and consolidation shall be into the Atlantic Coast Line Railroad Company, which is to continue as the name of the consolidated company, and the principal office or place of business of the Atlantic Coast Line Railroad Company in the city of Richmond, Va., shall continue to be the principal office or place of business of the consolidated company. * * *"

This agreement was submitted to the stockholders of the Savannah, Florida & Western Railway Company and duly ratified by them. and by reason of the terms of the agreement the stock of the Savannah. Florida & Western Railway Company was retired and canceled and the stock of the Atlantic Coast Line Railroad Company was issued therefor, and the Savannah, Florida & Western Railway Company from and after that date ceased to hold stockholders' and directors' meetings, elect officers, or to perform any other corporate functions, and the railway that had theretofore been operated by it became the property of the said Atlantic Coast Line Railroad Company, and was from that date

operated under the control and management of that company, and is now being operated and controlled under such management.

On the 12th day of May, 1902, at a meeting of the stockholders of the Atlantic Coast Line Railroad Company (the Virginia corporation hereinbefore referred to) held in the city of Richmond, it was resolved that the state of South Carolina be requested to issue to Henry G. Walters, Warren G. Elliott, Jas. J. Lucas, and Christopher S. Gadsden, and such other persons as were then or might thereafter become associated with them as the owners or stockholders of the merged, united, and consolidated company, and their successors as a merged, united, and consolidated body politic and corporate in perpetuity under the name of the "Atlantic Coast Line Railroad Company," etc., and after that date, to wit, 13th day of May, 1902, a certificate or charter of conso'idation and merger was granted by the state of South Carolina to the persons named in the resolutions in accordance with the laws of South Carolina (Code of Laws S. C. vol. 1, art. 3), as follows:

"Sec. 2050. It shall be lawful for any railroad company organized under the laws of this state, and operating a railroad, whether wholly within or partly within and partly without this state, under authority of this and any adjoining state, to merge and consolidate its capital stock, franchises and property with those of any other railroad company or companies organized and operated under the laws of this or any other state, whenever two or more railroads of the companies proposed to be consolidated are continuous or are connected with each other, or by means of any intervening railroad. Railroads terminating on the banks of any river which are or may be connected by ferry or otherwise shall be deemed continuous under this article. Nothing in this article contained shall be taken to authorize the consolidation of any company of this state with that of any other state whose laws shall not also authorize the like consolidation: Provided, that nothing contained in this section shall authorize any merger or consolidation inconsistent with the Constitution and laws of this state, with regard to parallel or competing railroad lines, but such merger and consolidation shall be subject to the limitations mentioned and specified therein: Provided, further, that when railroad companies are consolidated under the provisions of this article, a charter of incorporation for the new company so formed by such consolidation shall be issued to the owners and stockholders of the company so consolidating or to such of them as the stockholders of each of said companies shall designate: And provided, further, that only the fees now provided by law for consolidation be charged and no additional fee be charged for such charter.

"Sec. 2051. Said consolidation shall be made under the conditions, provisions, restrictions, and with the powers hereafter in this chapter mentioned and contained; that is to say:

"1. The directors of the several corporations proposing to consolidate may enter into a joint agreement, under the corporate seal of each company, for the consolidation of such companies and railroads, and prescribing the terms and conditions thereof, the mode of carrying the same into effect, the name of the new corporation, the number and names of the directors and other officers and their places of residence, the number of shares of the capital stock, the amount of par value of each share, and the manner of converting the capital stock of each of the said companies into that of the new corporation, and how and when directors and officers shall be chosen, with such other details as they shall deem necessary to perfect such new organization and the consolidation of said companies or railroads.

"2. Said agreement shall be submitted to the stockholders of each of the said companies or corporations at a meeting thereof called separately for the purpose of taking the same into consideration; due notice of the time and place of holding such meeting and the object thereof shall be given by a general notice, published in some newspaper in the city, town or county where

such company has its principal office or place of business; and at the said meeting of stockholders the agreement of the said directors shall be considered, and a vote by ballot taken for the adoption or rejection of the same, each share entitling the holder thereof to one vote; and said ballots shall be cast in person or by proxy; and if a majority of all the votes of all the stockholders shall be for the adoption of said agreement, then that fact shall be certified thereon by the secretary of the respective companies, under the seal thereof: and the agreement so adopted, or a certified copy thereof, shall be filed in the office of the Secretary of State, and shall from thence be deemed and taken to be the agreement and act of consolidation of the said companies, and a copy of said agreement and act of consolidation duly certified by the Secretary of State, under the seal thereof shall be evidence of the existence of said new corporation.

"Sec. 2052. Upon the making and perfecting of the agreement and act of consolidation, as provided in the preceding section and filing the same, or a copy, with the Secretary of State, as aforesaid, the several corporations, parties thereto, shall be deemed and taken to be one corporation by the name provided in said agreement and act, possessing within this state all the rights, privileges and franchises, and subject to all the restrictions, disabilities and duties of each of said corporations, so consolidated.

"Sec. 2053. Upon the consummation of said act of consolidation as aforesaid all and singular the rights, privileges and franchises of each of said corporations, parties to the same, and all the property, real, personal and mixed, and all the debts due on whatever accounts, as well as of stocks, subscriptions, and other things in action belonging to each of such corporations shall be taken and deemed to be transferred to and vested in such new corporation, without further act or deed; and all property, all rights of way and all and every other interest shall be as effectually the property of the new corporation as they were of the former corporation, parties by said agreement; and the title to real estate, either by deed or otherwise, under the laws of this state, vested in either of such corporations, shall not be deemed to revert or be in any way impaired by reason of this chapter: Provided, that all rights of creditors, and all liens upon the property of said corporations shall be preserved unimpaired; and the respective corporations may be deemed to continue in existence to preserve the same; and all debts, liabilities and duties of either of said companies shall thenceforth attach to said new corporation, and be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it.

"Sec. 2054. Such new company shall, as soon as may be convenient after such consolidation, establish such offices as may be desirable, one of which shall be at some point in this state on the line of its road, and may change the same at pleasure, giving public notice thereof in some newspaper published on the line of said road.

"Sec. 2055. Suits may be brought and maintained against such new company in any of the courts of this state for all causes of action in the same manner as against other railroad companies therein."

It appears from the evidence of Henry Walters, chairman of the board of directors of the Atlantic Coast Line Railroad Company, taken before the master, that there has never been any organization under the new charter, and that there has been no meeting of the incorporators, nor any election of directors. It also appears from the evidence that the Atlantic Coast Line Railroad Company still has its office in the state of Virginia, and that all of its business is transacted in the city of Richmond, under the same management and control as it was before the date of the agreement in question. It also appears from the evidence of John J. Nelligan, third vice president of the Atlantic Coast Line Railroad Company, that more than $1,000,000 of the stock of the Atlantic Coast Line Railroad Company is still outstanding.

150 F.—50

For the purposes of this case it is not necessary to discuss the effect of the different mergers referred to in the record occurring prior to April 10, 1902, these matters not being involved in this controversy, except to say that the Savannah, Florida & Western Railway Company, by successive mergers under the laws of South Carolina, Georgia, and Florida, became the owner of all the lines which it was operating at the date it entered into the agreement of merger and consolidation with the defendant company; and the consideration of the questions involved in this case as to the effect of such agreement will necessarily determine any questions involved as to the validity of the several agreements of merger and consolidation by which it acquired the property that it owned and possessed at the date of the agreement now under consideration. The master to whom this case was referred is a capable and painstaking lawyer, and he concludes, after finding the facts in the case, that the agreement did not have the effect of creating a new company, but that the Atlantic Coast Line Railroad Company, by the terms of the agreement, acquired all the right, title, and franchises of the Savannah, Florida & Western Railway Company, and that the Coast Line Company became enlarged thereby and is still in existence as a foreign corporation.

In order to determine the different questions raised by the petition for removal and the answer thereto, it is necessary that the court should decide three questions: First: Whether the consolidation of the property of the Savannah, Florida & Western Railway Company with the Atlantic Coast Line Railroad Company, a Virginia corporation, vested the Virginia corporation with the right, title, and interest of such property and franchises to such an extent as to cause the local corporation, as such, to cease to exist, or whether the agreement in question had the effect to create a new company. Second: Whether the action on the part of the directors of the Atlantic Coast Line Railroad Company, incorporated under the laws of the state of Virginia, in taking out a charter in the state of South Carolina, had the effect of domesticating the company thus consolidated, so as to deny it the right which it enjoyed as a foreign corporation of the removal of cases instituted against it in the state court to the federal court. Third: Whether this court, in view of the pleadings, erred in permitting the removant to amend its petition.

As stated, it is necessary first to determine as to whether the merger and consolidation of the property of the Savannah, Florida & Western Railway Company with the Atlantic Coast Line Railroad Company was such as to cause the Savannah, Florida & Western Railway Company to lose its identity and thereby become the property of the Atlantic Coast Line Railroad Company, a corporation of the state of Virginia, or, on the other hand, whether the agreement between these two companies was such as to constitute a consolidation of the properties of the two original companies in such a manner as to dissolve such companies and create therefrom an entirely new company, and in consequence of which the two old companies ceased to exist. The agreement in question employs the term "consolidation and merger," and it therefore becomes necessary, in order to ascertain the true meaning and effect of the contract, to carefully consider its provisions and what

was done in pursuance thereof. As in such cases, there are two parties to the contract, and these parties are the Atlantic Coast Line Railroad Company, a Virginia corporation, and the Savannah, Florida & Western Railway Company, a corporation doing business in South Carolina by virtue of the laws of Georgia and South Carolina.

The contracting parties evidently entered into this agreement with a thorough understanding as to the object proposed to be accomplished thereby. It was obviously the purpose of the Virginia corporation to acquire the property of the Savannah, Florida & Western Railway Company, a corporation existing by virtue of the laws of Florida and Georgia, domesticated under the laws of South Carolina, and doing business in that state, to be operated as a part of its system of railroads; and it was likewise the purpose of the Savannah, Florida & Western Railway Company to dispose of its property and cease to do business under the charters by which it had theretofore operated its line of railroad. This being the situation at the time the agreement was entered into, among other things, it should be borne in mind that, while all the stock of the local corporation was surrendered and canceled, nevertheless about $1,000,000 worth of the capital stock of the Atlantic Coast Line Railroad Company (or the parent company) was not canceled, but is still outstanding, thus clearly indicating that, while it was the purpose of the parties that the local corporation should cease to exist, it was also their intention that the Atlantic Coast Line Railroad Company should be the sole survivor, and as such should own and control all the property, rights, and franchises which it had acquired by purchase as hereinbefore stated, and that it was to own and possess all of the property, rights, titles, and franchises thus purchased, to the same extent and in the same manner as it owned and possessed the property which it originally acquired by virtue of the charter that brought it into existence.

The results of a merger are entirely different from those of a consolidation. Ordinarily, when corporations of two or more states "consolidate," in the technical sense of the term, the old corporations are dissolved and a new corporation comes into being in each state. Note to Morrison v. Snuff Company, 89 Am. St. Rep. 655; 2 Elliott on Railroads, § 335. However, when two corporations unite by way of merger, the result is not the same as in case of consolidation. In the case of merger the one is absorbed by the other, and when we come to apply the true test as to whether, under a given statement of facts, there has been a merger, it becomes necessary to ascertain whether the existence of one of the corporations, as such, has been preserved, and the other has ceased to exist. In the case of Atlantic & Gulf R. R. Co. v. Georgia, 98 U. S. 359, 25 L. Ed. 185, the court, in discussing the question as to the difference between a merger and a consolidation, among other things, said:

"That generally the effect of consolidation, as distinguished from a union by merger of one company into another, is to work a dissolution of the companies consolidating, and to create a new corporation out of the elements of the former, is asserted in many cases, and it seems to be a necessary result."

Also in the case of Vicksburg, etc., Telephone Co. v. Citizens' Telephone Co., 79 Miss. 341, 30 South. 725, 89 Am. St. Rep. 656, it is said:

"There seems to be a great confusion as to the difference between consolidation and merger and sale. Rightly understood, there never can be a consolidation of corporations, except where all the constituent companies cease to exist as separate corporations, and a new corporation, to wit, the consolidated corporation, comes into being. A merger, rightly understood, is not the equivalent of consolidation at all, but exists where one of the constituent companies remains in being, absorbing or merging in itself all the other constituent corporations."

1 Thompson on Corp. § 396, states the law as follows:

"It has been seen that consolidations frequently take the form of one company purchasing. the capital stock of another. In such cases, and in others that may be imagined, the terms of the union may be such that one corporation, without any change of name, merely absorbs or annexes the other. In such a case the absorbing corporation continues unaffected. and the other is dissolved. Railway consolidations, for instance, often take the form of the absorption by one railway of others, as where branches are united with a trunk line, or short lines are united with longer lines, so as to form one continuous line, in which case the absorbing company proceeds without any change of name, and succeeds to the rights possessed by the absorbed company."

In considering this question it should be remembered that the act of the General Assembly of Virginia of January 12, 1900, authorized the Atlantic Coast Line Railroad Company of Virginia to change its name and also "to consolidate with itself" other corporations. To consolidate with itself other corporations must be construed to mean that it could consolidate with other companies, provided it retained its existence as a Virginia corporation, and that any contract of consolidation which it might enter into with other companies should involve the merging of such companies into it. This provision in its charter clearly indicates the extent to which it could go in any contract which it might enter into for the purpose of acquiring the property, rights, and franchises of other corporations, and should be remembered in the discussion of the propositions involved in this controversy.

It is insisted by counsel for plaintiff that the case of Railroad Company v. Georgia, 98 U. S. 359, 25 L. Ed. 185, should control in determining this question. In that case the two companies were consolidated by virtue of an act of the Legislature, which authorized a consolidation of the stock of both companies and conferred upon the consolidated company full corporate powers, and also provided that it should enjoy the franchises, privileges, and immunities which the companies had enjoyed by their original charters. In discussing the effect of the agreement in that case the court, among other things, said:

" * * * It contemplated, therefore, that the separate capital of each company should go out of existence as the capital of that company; and, if so, how could either have a continued separate being? True, the proviso to the first section declared that nothing therein contained should relieve or discharge either of the companies from any contract theretofore entered into by either, adding: 'But this company [that is, the company created by the act] shall be liable on the same.' It is thus distinguished between the two original companies and the one contemplated to be formed by their consolidation. And the proviso would have been quite unnecessary, had it not been thought by the Legislature that the consolidation would work a dissolution of the amalgamated companies. Hence it was considered necessary to preserve the rights of the parties who might have contracted with them. Only their contracts were mentioned in the proviso, and that in order to authorize a novation. The third section continued in force the several immunities, franchises,

and privileges granted by the original charters and the amendments thereof, and the liabilities therein imposed, but plainly for the benefit of the consolidated companies. Why speak of original charters, if a later charter was not intended by the act? That such was the intention appears still more clearly in the third section. That conferred upon the consolidated stockholders complete corporate powers. It granted to them, when consolidated, not only a corporate name, but the right under that name to acquire and hold property, to sue and be sued, to have a common seal, to make by-laws, and generally to do everything that appertains to corporations of like character. This full grant of corporate power must have been intended for some purpose. What was it, if not to create a corporation? For that purpose it was amply sufficient. For any other it was unmeaning. If the two original companies were to continue in being, if it was not contemplated that they should be dissolved by consolidation, a new grant of corporate power and existence was unnecessary. They had it already. Looking thus at the legislative intent appearing in the consolidation act, we are constrained to the conclusion that a new corporation was created by the consolidation effected thereunder in the place and in lieu of the two companies previously existing, and that whatever franchises, immunities, or privileges it possesses it holds them solely by virtue of the grant that act made. That generally the effect of consolidation, as distinguished from a union by merger of one company into another, is to work a dissolution of the companies consolidating, and to create a new corporation out of the elements of the former, is asserted in many cases, and it seems to be a necessary result. In McMahan v. Morrison, 16 Ind. 172. 79 Am. Dec. 418, the effect of a consolidation was said to be 'a dissolution of the corporations previously existing, and at the same instant the creation of a new corporation, with property, liabilities, and stockholders derived from those then passing out of existence.' So in Lauman v. Lebanon Valley R. R. Co., 30 Pa. 42, 72 Am Dec. 685, the court said: 'Consolidation is a surrender of the old charter by the companies, the acceptance thereof by the Legislature, and the formation of a new company out of such portions of the old as enter into the new.' This court, in Clearwater v. Meredith, 1 Wall. 40, 17 L. Ed. 604, expressed its approval of what was said in the former of these cases. It is true these expressions have not all the weight of authority, for they were not necessary to the decisions made; but they are worthy of consideration, and they are in accordance with what seems to be sound reason. When, as in this case, the stock of two companies is consolidated, the stockholders become partners, or quasi partners, in a new concern. Each set of stockholders is shorn of the power which, as a body, it had before. Its action is controlled by a power outside of itself. To illustrate: The stockholders of the Savannah & Albany Railroad Company could not, after consolidation, have exercised any of the powers or franchises they had prior to their consolidation with the stockholders of the Atlantic and Gulf Railroad Company. They could not have built their road or controlled its management. They could not, therefore, have performed the duties which by their original charter was imposed upon them. Those duties could only have been performed by another organization, composed partly of themselves and partly of others. Their powers, their franchises, and their privileges were therefore gone, no longer capable of exercise or enjoyment. Gone where? Into the new organization, the consolidated company, which exists alone by virtue of the legislative grant, and which has all its powers, facilities and privileges by virtue of the consolidation act. What, then, was left of the old companies? Apparently nothing. They must have passed out of existence, and the new company must have succeeded to their rights and duties. But the new company comes into existence under a fresh grant. Not only its being, but its powers, its franchises and immunities, are grants of the Legislature which gave it its existence. * * * "

It is also insisted that Miss., etc., R. R. Company v. Adams, 180 U. S. 1, 21 Sup. Ct. 240, 45 L. Ed. 395, is authority for the contention that the agreement in question is such, as to create a new company. In that case the court expressly states that it was contemplated by the agreement that the constituent companies should go out of existence,

and their officers should resign their trusts in favor of the new com-
pany; also that the board of directors should be supplanted by another
board, that all of the stocks of the constituent companies should be sur-
rendered, and other stocks taken in lieu thereof, or that the old stock
should be recognized as the stock of the new company, and that the
road should be operated by officers holding their commissions from the
new company, and that the entire administration of the affairs of
the old companies should be surrendered to the new corporation. It
was held that nothing was left of the constituent companies "but the
memory of their existence, the mere shadow of a name; but the new
company which took their place suddenly sprang into life with a new
corp of officers, a full equipment for the successful operation of the
road." In discussing this phase of the question, the court, among
other things, said:

"While, as stated in Tomlinson v. Branch, 15 Wall. 460, 21 L. Ed. 189, the
presumption is that when two railroads are consolidated, each of the united
lines will be respectively held with the privileges and burdens originally attach-
ing thereto, subsequent cases have settled the law that where two companies
agree together to consolidate their stock, issue new certificates, take a new
name, elect a new board of directors, and the constituent companies are to
cease their functions, a new corporation is thereby formed subject to existing
laws. But if, as was the case in Tomlinson v. Branch, one road loses its iden-
tity and is merged into another, the latter preserving its identity and issuing
new stock in favor of the stockholders of the former, it is not the creation of
a new corporation, but an enlargement of the old one. In such case it was
held that, where the company which had preserved its identity held as to its
own property a perpetual exemption from taxation, it would not be extended
to the property of the merged company without express words to that effect."

The case of Tomlinson v. Branch, supra, makes clear the distinc-
tion between the effect of consolidation and that of merger. In that
case it was held that in case of merger one of the roads loses its identity,
while the identity of the other road into which it is merged is preserved;
that under such circumstances it is not the creation of a new company,
but is an enlargement of the one which takes the property of the
other. In the case at bar the substance of the Savannah, Florida &
Western Railway Company is destroyed and there is nothing by which
it could be located—nay, not even a "shadow" is left to indicate its
former existence.

Counsel for plaintiffs also cite the following cases in support of their
contention: Shields v. Ohio, 95 U. S., 323, 24 L. Ed. 357; R. R. Co.
v. Maine, 96 U. S. 499, 24 L. Ed. 836; St. Louis Iron Mt. Co. v. Berry,
113 U. S., 465, 5 Sup. Ct. 529, 28 L. Ed. 1055. The court has carefully
considered these cases, and is of the opinion that the facts upon which
the decisions were based are quite different from the facts in the case at
bar. In these cases it was clearly the intention of the parties by con-
solidation to form new and independent companies, and to surrender the
charters under which the old companies had been operating prior to the
dates of consolidation; and it appears that the stock of the original
companies in each instance was surrendered, but in the case at bar the
foreign corporation is still in existence, and is managed and controlled
by the same parties and in the same way and manner as before the
agreement was made. In other words, in the cases relied upon by
plaintiffs, the agreements of consolidation were such as to cause both of

the original corporations to cease to exist as legal entities and out of the parts taken from the old corporations an entirely new and independent corporation was created; whereas, in this case, as has been stated, more than $1,000,000 of the capital stock of the Atlantic Coast Line Railroad Company is still outstanding, thus showing conclusively that the agreement entered into between the parties did not have the effect of destroying both of the old companies, but, on the other hand, it appears that the corporation known as the "Atlantic Coast Line Company" is still in existence and has not changed its management in any manner whatsoever.

Numerous other authorites could be cited to sustain the contention that in case of merger one of the companies completely loses its identity as such, and becomes a constituent part of the company into which it is merged; but the court deems it unnecessary to do so in this case. In the case at bar the terms of the agreement entered into by the respective companies, as well as the negotiations prior thereto, clearly indicate that it was the purpose of the parties to effect a merger. The Atlantic Coast Line Railroad Company still continues to operate its lines under the same control and management as it did prior to the date of the agreement of consolidation, and since the date of the merger has owned, controlled, and managed all of the property which had theretofore been owned and operated by the Savannah, Florida & Western Railway Company; while, on the other hand, the Savannah, Florida & Western Railway Company has ceased to own, control, manage, or operate the lines which it had operated prior to that date, all of its property, rights, and franchises having passed by purchase and sale to the Atlantic Coast Line Railroad Company, and the officials of that company, who had theretofore managed and controlled its operations, have ceased to act as such. In a word, the corporation under which such lines of railroad were operated has ceased to exist as a legal entity by virtue of the agreement of consolidation and merger. Under these circumstances the court is of opinion that no new company was created by the terms of this agreement.

The next question to be determined is as to whether the action of the directors of the Atlantic Coast Line Railroad Company, after acquiring the property of the Savannah, Florida & Western Railway Company in pursuance of the consolidation and merger agreement, in taking out a charter or certificate of merger and consolidation in the state of South Carolina, had the effect of domesticating the company thus consolidated, or of depriving it of the right which it had theretofore enjoyed as a foreign corporation to invoke the jurisdiction of this court. It appears from the record that after the agreement of merger and consolidation had been entered into on the 12th day of May, 1902, the stockholders of the Atlantic Coast Line Railroad Company, a corporation of Virginia, hereinbefore referred to, at a meeting held in the city of Richmond, Va., passed a resolution requesting the state of South Carolina to issue to Henry Walters, Warren G. Elliott, James J. Lucas, and Christopher S. Gadsden, and such other persons as were then or might thereafter become associated with them as stockholders, a charter or certificate of incorporation as a merged, united, and consolidated company and body politic and corporate in perpetuity under

the name of the "Atlantic Coast Line Railroad Company," etc., and after that date, to wit, on the 13th day of May, 1902, a certificate of charter of consolidation and merger was granted by the state of South Carolina to the persons named in the resolution in accordance with the laws of South Carolina, as follows:

"Charter.

"State of South Carolina.

"Whereas, it appears from the certificates on file in my office of the secretaries of the Atlantic Coast Line Railroad Company and the Savannah, Florida & Western Railway Company that the said companies have entered into articles of agreement and consolidation, filed with and as a part of each of the said certificates of said secretaries of the said companies; and

"Whereas, it further appears from the certificates of the secretaries of the said companies that the said articles of agreement and consolidation have been approved, sanctioned, adopted, and confirmed by the stockholders of each of said companies, at separate meetings held in pursuance of law, and after due notice; and

"Whereas, it further appears from the said certificates of the said secretaries that the stockholders of each of said companies, at their respective meetings, adopted and passed a resolution that the state of South Carolina be requested to issue to Henry Walters, Warren G. Elliott, James J. Lucas, and Christopher S. Gadsden, and such other persons as now may be, or hereafter may become, associated with them as the owners and stockholders of the merged, united, and consolidated company, and their successors, a charter as a merged, united, and consolidated body politic and corporate, in perpetuity, under the name of the Atlantic Coast Line Railroad Company, having, possessing, holding, and enjoying each, every, and all of the rights, powers, privileges, immunities, and franchises of every nature whatsoever set forth in said articles of agreement and consolidation, and each, every, and all of the rights, powers, privileges, immunities, and franchises of every nature whatsoever granted to, held, possessed, or enjoyed by each of the constituent corporations merging, uniting, and consolidating into the Atlantic Coast Line Railroad Company, not in conflict with the terms and provisions of said articles of agreement and consolidation:

"Now, therefore, I, M. R. Cooper, Secretary of the State of South Carolina, by virtue of the power and authority vested in me, in the name of the state of South Carolina, hereby issue to Henry Walters, Warren G. Elliott, James J. Lucas and Christopher S. Gadsden, and such persons as now may be, or hereafter may become, associated with them as the owners and stockholders of the merged, united, and consolidated company, and their successors, a charter as a merged, united, and consolidated body politic and corporate, in perpetuity, under the name of the Atlantic Coast Line Railroad Company, having, possessing, holding, and enjoying each, every, and all of the rights, powers, privileges, immunities, and franchises, of every nature whatsoever, set forth in said articles of agreement and consolidation, and each, every, and all of the rights, powers, privileges, immunities, and franchises of every nature whatsoever granted to, held, possessed, or enjoyed by each of the constituent corporations merging, uniting, and consolidating into the Atlantic Coast Line Railroad Company, not in conflict with the terms and provisions of said articles of agreement and consolidation, and I do hereby certify that the fees provided by law for consolidation have been paid by the consolidated Atlantic Coast Line Railroad Company."

Section 1 of the act under which the consolidation and merger was formed provides that the directors of the several corporations proposing to consolidate may enter into a joint agreement, under the corporate seal of each company, for the consolidation of said companies and railroads, and prescribing the terms and conditions thereof, and among other things it is provided that they may determine "the manner of con-

verting the capital stock of each of the said companies into that of the new corporation." The terms "merger" and "consolidation" are both used in the act under which the certificate or charter in question was issued, which clearly indicates that a merger, as well as a consolidation, could be formed in accordance with its provisions, and this section, which provides that the parties may determine "the manner of converting the capital stock of each of the said companies into that of the new corporation," must be construed as applying to those cases wherein the capital stock of both of the old companies is surrendered and a new company formed, and, of course, in such cases the issuance of a charter or certificate of incorporation would be treated as a charter in the fullest sense of the term; and if in this instance there had been an abandonment of the charters of both of the companies and the stock of each of said companies had been converted into that of a new corporation, then the acceptance of a charter under such circumstances would have constituted the new company a citizen of that state. If, on the other hand, the articles of agreement show, as is shown in this case, that a merger, and not a consolidation, was formed, and that one of the original companies is still in existence, then the granting of a charter to such corporation could not affect its status in so far as its citizenship is concerned.

Section 8, art. 9, of the Constitution of South Carolina provides as follows:

"Consolidation of any railroad lines and corporations in this state with others shall be allowed only where the consolidated companies shall become a domestic corporation in this state. * * *"

The Atlantic Coast Line Railroad Company had become a domestic corporation of South Carolina as far back as April, 1900. At that time it became a domesticated foreign corporation, authorized by the Constitution of South Carolina to consolidate with South Carolina corporations, without the creation of a new consolidated company, and without affecting its status as a citizen of Virginia. As has already been said, the law contemplated both merger and consolidation. Section 2050, Code of Civil Laws of 1902 of South Carolina authorizes a railroad organized under the laws of South Carolina "under the authority of this and any adjoining state to merge and consolidate," etc., and, among other things, this section contains a proviso which reads:

"Provided, that nothing contained in this section shall authorize any merger or consolidation inconsistent with the Constitution and laws of this state, with regard to parallel or competing railroad lines, but such merger and consolidation shall be subject to the limitations mentioned and specified therein."

That is, the law contemplates either merger or consolidation, provided it does not violate the Constitution. The section of the Constitution supra shows that it is lawful for a South Carolina corporation to effect a merger with a foreign corporation which has been domesticated. In the case of Wilson v. So. Railway Co., 64 S. C. 162, 36 S. E. 701, 41 S. E. 971, the court, among other things, said:

"We have been induced to review the case of Mathis v. Southern Railway, 53 S. C. 257, 31 S. E. 240, and after careful consideration have reached the conclusion that it is not in harmony with the recent decisions of the United

States Supreme Court, by which this court must be controlled on questions of this kind. The Mathis Case was supposed to be in harmony with the decision in Memphis R. R. Co. v. Alabama, 2 Sup. Ct. 432, 27 L. Ed. 518, wherein it seemed to hold that the Memphis & Charleston Railroad Company, previously incorporated in Tennessee and afterwards made an Alabama corporation by the statutes in Alabama, could not remove into the Circuit Court of the United States a suit brought against it in Alabama by a citizen of Alabama. But this court failed to observe the distinction beween the creation of a new corporation out of natural persons and the mere adoption of a foreign corporation as a domestic corporation for local purposes. A corporation is indisputably presumed to be composed of citizens of the state creating it, and, for purposes of federal jurisdiction, the citizenship of its corporators is imputed to the corporation. * * * "

It cannot be said that this opinion undertakes to construe the act under which application was made by the defendant to the state of South Carolina to grant it a charter, inasmuch as the act in question was passed since the opinion in this case was delivered. However, it bears directly on the question at issue and clearly states the law which applies to cases like the one at bar. In order to ascertain what was the legal status of the Atlantic Coast Line Railroad Company after it became enlarged by the absorption of the Savannah, Florida & Western Railway Company, it becomes necessary to determine whether a foreign corporation can be reincorporated in a state other than that in which it is created, so as to make it a corporation of that state in the ordinary acceptation of the term. Being of opinion that by the terms of the consolidation and merger the Atlantic Coast Line Railroad Company became enlarged thereby, and that it still retains its identity as a Virginia corporation, it becomes necessary to decide what was the effect of the action of the directors of that company in applying for a charter or certificate of consolidation and merger or incorporation from the state of South Carolina. In this connection it should be borne in mind that the service of process was made upon the agents of the Atlantic Coast Line Railroad Company, the office and principal place of business of said company being at Richmond, in the state of Virginia. This circumstance strongly tends to sustain the conclusion that the corporation sued is the Atlantic Coast Line Railroad Company, which was organized under and by virtue of the laws of the state of Virginia; there being no officers of any other company in South Carolina upon whom service of process could be had at the time of the institution of these suits.

It is insisted by counsel for plaintiff that the action of the directors of the Atlantic Coast Line Railroad Company in applying for a charter or certificate of merger and consolidation hereinbefore quoted had the effect of reincorporating the Atlantic Coast Line Company in South Carolina, so as to make it a citizen of that state for all purposes. This question has been passed upon in a number of cases, and, among others, in the case of Louisville, etc., R. R. v. Louisville Trust Co., 174 U. S. 564, 19 Sup. Ct. 821, 43 L. Ed. 1081, it is said:

"This court has often recognized that a corporation of one state may be made a corporation of another state by the Legislature of that state in regard to property and acts within its territorial jurisdiction. The acts done by the Louisville, New Albany & Chicago Railway Company under the statutes of Kentucky, while affording ample evidence that it had accepted the grants thereby made, can hardly affect the question whether the terms of those stat-

utes were sufficient to make the company a corporation of Kentucky. But a decision of the question whether the plaintiff was or was not a corporation of Kentucky does not appear to this court to be required for the disposition of this case, either as to the jurisdiction or as to the merits. As to the jurisdicion, it being clear that the plaintiff was first created a corporation of the state of Indiana, even if it was afterwards created a corporation of the state of Kentucky also, it was and remained, for the purposes of the jurisdiction of the courts of the United States, a citizen of Indiana, the state by which it was originally created."

This view is also sustained by the following cases: Southern Railway Co. v. Allison, 190 U. S. 326, 23 Sup. Ct. 713, 47 L. Ed. 1078; St. Louis R. R. Co. v. James, 161 U. S. 545, 16 Sup. Ct. 621, 40 L. Ed. 802. In view of the law as decided in these cases, the certificate or charter issued by the state of South Carolina could not have the effect of changing the character of the Atlantic Coast Line Railroad Company to the extent of making it a citizen of that state. While it would be void as a charter to that extent at the same time it was proper that it should be issued as a certificate of domestication, and could be used for that purpose; but in view of the agreement between the parties, which clearly fixed the status of the Atlantic Coast Line Railroad Company to be that of a foreign corporation, it could not be treated as a charter having for its object the creation of a new company.

It is also insisted by the plaintiff that the case of Memphis & Charleston R. R. v. Alabama, 107 U. S. 581, 2 Sup. Ct. 432, 27 L. Ed. 518, should control the case at bar. In that case it was held that the Memphis & Charleston Railroad Company, having been made by the statutes of Alabama a corporation of that state, although having been previously incorporated in Tennessee, could not remove a suit into the federal court which had been brought against it in Alabama by a citizen of that state. In that case the company was required by the Legislature of Alabama to open books in that state for the subscription to the capital stock of the corporation, so as to afford the citizens thereof an opportunity to take stock to the amount of $1,500,000 of the capital of the company. The act in question also provided that the company should at the first meeting of the stockholders designate a time and a place or places in northern Alabama where, for the convenience of citizens of that state who might become stockholders, and that an election should be held, notice whereof was to be given in the newspapers, and it was also provided that the election for directors should be held at the same time in both Alabama and Tennessee. The Supreme Court held that by reason of the particular language used in the act there was a separate original Alabama corporation formed; that the sections, taken altogether, made it a corporation created as well as controlled by the state of Alabama. Among other things it is said in the opinion:

"The whole act, taken together, manifests the understanding and intention of the Legislature of Alabama that the corporation, which was thereby granted a right of way to construct through this state a railroad, with which any railroad company chartered or to be chartered in this state should have the right to connect its road, and which was required to construct a branch railroad in this state, to open books for subscriptions of stock to a certain amount in this state, to apply the moneys here subscribed to the construction of the road within the state, and to hold election in this state, was and should be in law a corporation of the state of Alabama, although having one and the same or-

ganization with the corporation of the same name previously established by the Legislature of Tennessee."

In that case the application was made to the Legislature for permission to charter and organize a company under and by virtue of the laws of the state of Alabama, and the Legislature by the terms of the act granting the charter clearly provided that the charter thus granted was granted for the purpose of creating an independent company in that state. It was evidently the purpose and intention of the Legislature to create a new corporation of that state, and those who were seeking to form a corporation accepted the charter with full knowledge of the provisions of the act which created the same.

In the case of Memphis R. R. Co. v. Alabama, at page 584 of 107 U. S., page 435 of 2 Sup. Ct. (27 L. Ed. 518), among other things, it is said:

"The subsequent acts of the state of Alabama point in the same direction, and each speaks of the company as incorporated or chartered by the Legislature of Alabama. The act of the 12th of February, 1850, is entitled 'An act to amend an act entitled "An act to incorporate the Memphis & Charleston Railroad Company," approved January 7, 1850,' and provides that if 'subscribers to the capital stock of the Memphis & Charleston Railroad, in the state of Alabama, from a failure to obtain the necessary legislation from the states of Tennessee and Mississippi, or from any other cause, deem it expedient to form a separate and independent organization, then and in that event they are hereby vested with full power and authority to do the same; and said company so organized shall be known by the name and style of the Mississippi & Atlantic Railroad Company, and shall have and enjoy all the rights, privileges and powers heretofore granted or intended to be granted, and be subject to all the limitations, restrictions and liabilities heretofore imposed or intended to be imposed in the several acts incorporating the Memphis & Charleston Railroad Company.' St. Ala. 1849–50, p. 185, No. 129. The act of the 7th of February, 1856, which, as mentioned in its title and provided in its first section, grants to 'the Memphis & Charleston Railroad Company' a right of way for an extension of its road through the territory of this state, expressly provides in the second section that 'said right of way is granted upon the same terms, restrictions, liabilities and conditions, that the right of way is granted to said company under the charter granted to said company by the General Assembly of this state, and approved 7th of January, 1850.' St. Ala. 1855–56, p. 298, No. 302. The defendant, being a corporation of the state of Alabama, has no existence in this state as a legal entity or person, except under and by force of its incorporation by this state, and, although incorporated in the state of Tennessee, must, as to all its doings within the state of Alabama, be considered a citizen of Alabama, which cannot sue or be sued by another citizen of Alabama in the courts of the United States. Ohio & Miss. R. R. Co. v. Wheeler, 1 Black, 286, 17 L. Ed. 130; Railway Co. v. Whitton, 13 Wall. 270, 283, 20 L. Ed. 571."

In the case of Southern Railway Co. v. Allison, 190 U. S. 338, 23 Sup. Ct. 718, 47 L. Ed. 1078, the court, in referring to the case of Memphis & Charleston R. R. Co. v. Alabama, says:

"The difference between the above case and the cases we have already referred to is plain and fundamental, but in any event we regard the James Case, reaffirmed and approved, as it is, by that of Louisville, etc., Railway v. Trust Company, 174 U. S. 552, 19 Sup. Ct. 817, 43 L. Ed. 1081, as decisive of the case before us. We do not subscribe to the doctrine that if a corporation files its charter in one state, after having been chartered in another state, and is sued, by a citizen of the state in which it filed its charter, in the state courts of that state, the right of removal to the federal courts will be denied, while at the same time, if such a corporation is sued, by a citizen of the state in which

it filed its charter, in the United States courts, the jurisdiction of the United States courts will be sustained upon the ground that in the federal courts the corporation is domestic in the state where it was originally created and where its original incorporators are citizens, and it will be conclusively presumed as a matter of law that they are citizens of the state originally chartering it. If there be jurisdiction in the United States courts in the latter case, on the ground that it is a corporation and citizen of the state in which it was created, that fact gives jurisdiction to the federal court to remove the case from the . state court, when the corporation is sued by a citizen of the state in which it filed its charter, because such corporation is a citizen of another state, namely, the state in which it was originally created. The citizenship of the corporation is not changed because of the particular court in which the action is commenced. If it be a citizen of another state in the one case, it is such a citizen also in the other, and, if the other party to the action be a citizen of a state other than the one which created the corporation, the jurisdiction of the federal courts exists, and the right of the corporation (upon complying with the statutes) to remove the case from the state court, when it is sued by a citizen of the state where its charter may have been subsequently filed, is granted by the laws of the United States."

A careful analysis of these cases leaves no doubt as to what is necessary to be done in order to create a new corporation.

It was insisted by the plaintiffs in the case of Southern Railway Company v. Allison, supra, as well as the other cases quoted, that, where a foreign corporation filed its charter with the Secretary of State for the purpose of domestication or takes out a charter of incorporation in another state, it thereby becomes reincorporated in that state to the extent of creating it a citizen of such state for jurisdictional purposes. But the Supreme Court in these cases has decided that it only becomes a citizen of the state under such circumstances to the extent of domestication, and that in doing so it does not lose its right as a foreign corporation, when the jurisdictional amount is involved, of having its suit removed to the Circuit Court of the United States. In cases like the one at bar, when it appears that no new company has been formed by the contract or merger and consolidation, and that one of the companies takes a conveyance of all the property, rights, and franchises of the other, the company thus enlarged stands precisely on the same footing as did the foreign company in the case of Southern Railway Company v. Allison. The first provision of the agreement is as follows:

"The said merger, union, and consolidation shall be into the Atlantic Coast Line Railroad Company, which is to continue as the name of the consolidated company, and the principal office or place of business of the Coast Line Company in the city of Richmond shall continue to be the principal office or place of business of the consolidated company."

Thus it will be seen that the agreement provides that the "merger, union, and consolidation shall be into the Atlantic Coast Line Company," signifying that the Atlantic Coast Line Railroad Company, which was then in existence, with its principal office in the city of Richmond should continue in business under the same name, in the same state, and in the same office in which it had theretofore been transacting the business of that company. This provision states that the Atlantic Coast Line Railroad Company, which was brought into existence by virtue of the laws of the state of Virginia, is to continue as a legal entity, which leaves no doubt that it was the purpose of the parties to

such agreement that said company should remain in existence as a part of the terms by which the contract was entered into. It is true that it is termed a "consolidated company"; but the term "consolidated" is used for the purpose of conveying the idea that it had been enlarged, in so far as its property holdings were concerned, by acquiring the rights, franchises, etc., of the Savannah, Florida & Western Railway Company. This was also necessary in order to enable the state of South Carolina to act intelligently in exercising the power to assess and collect the taxes due that state on the property thus conveyed to the Atlantic Coast Line Company. The above provision in the contract makes it perfectly clear that in the beginning the Atlantic Coast Line Railroad Company, a corporation organized under the laws of the state of Virginia, was the grantee in the agreement, and that the Savannah, Florida & Western Railway Company was the grantor; and it is also perfectly plain that by the terms thereof the defendant company became the absolute owner of all of the property of the grantor as completely and to the same extent as if it had been conveyed to it by a deed in fee simple.

In considering the effect of the action of the Atlantic Coast Line Railroad Company after the consolidation and merger, as hereinbefore referred to, it must be remembered that the charter or certificate which was granted has never been used for any purpose whatever by that company. There has never been a meeting of any officials, in the state of South Carolina or elsewhere; nor has there been any stock issued in pursuance thereof. In a word, there has been no action on the part of the foreign company, since its enlargement, that in the slightest degree tends to show that it accepted the instrument thus granted to be used as a charter; nor has it ever attempted to exercise any real or implied powers granted by virtue of the same in the transaction of its business. This strongly corroborates the theory that the issuing of the same only had the effect of domesticating the company thus enlarged by the merger for all purposes, except that of depriving it of its right to assert its citizenship as being in the state of its creation. The terms of the agreement were before the Secretary of State at the time he granted the charter or certificate, and those terms were of such a character as to show that the charter or certificate that was requested to be granted was to be treated as authority to the newly acquired owner of the property of the Savannah, Florida & Western Railway Company to transact business in the state of South Carolina as a consolidated or enlarged company, and in view of these circumstances it is fair to conclude that the Atlantic Coast Line Railroad Company, thus enlarged, was to be treated as a foreign corporation which had made application to domesticate under the laws of that state. It was the duty of the Secretary of State to carefully scrutinize the terms of the agreement, and it is fair to assume that he did so; and, having done so, the presumption is that the charter or certificate was granted for the purpose of enabling the Atlantic Coast Line Company to operate and control the property thus acquired in the same manner, to wit, to operate the property thus acquired as a foreign corporation in the same manner that it had been operating the property which it had theretofore acquired in the states of North and South Carolina.

The act under which the charter or certificate of consolidation, union, and merger was issued not only contemplates the consolidation of companies in South Carolina with companies created by the laws of other states, but it also contemplates union and merger; and there is nothing in the agreement in question to justify the assumption that a new company was to be formed by consolidation and merger, but, on the other hand, it is apparent that it was the intention of the parties that the property of the Savannah, Florida & Western Railway Company should be merged into the defendant company. If the terms of the agreement had been of such a character as to constitute a consolidation of the constituent parts of the two old companies, and as a result the formation of an entirely new company, then any charter that might have been issued to the company thus formed would have been a charter in the fullest sense of the term, and the application and acceptance of the same by the new company thus formed would undoubtedly have constituted it a citizen of the state of South Carolina. In such a case there would have been a surrender of all of the stock of both of the old companies, and an abandonment of the charters under which they had been operating, and, of course, the owners of the stock, property, rights, and franchises of the old companies would occupy the same position as individuals who sought to form a new company in the first instance, and would be powerless to act as a corporation until they could secure by legislative grant a charter conferring upon them powers, privileges, and franchises, similar to those contained in the charters thus abandoned, to enable the corporation so formed to transact business or execute the purposes for which it was organized. In other words, where two or more corporations desire to consolidate, and in order to do so abandon their charters and pool their interests, any charter granted after a new company has been formed must necessarily be treated as the authority upon which the new company which is proposed to be formed is brought into existence; and if in this case the Atlantic Coast Line Company had surrendered its stock and abandoned its charter, and had done those things which were necessary to cause it to cease to exist as a legal entity, and out of the constituent parts of the two old companies a new organization had been formed, and upon the request of the directors of the company thus formed a charter had been issued, and the new company accepted the same and proceeded to operate its lines under such charter, undoubtedly such action on its part would have made it a citizen of the state of South Carolina. However, in the case at bar, the defendant company has not abandoned the charter under which it had operated prior to the date of the agreement, but still retains and exercises all the rights, powers, and privileges under the charter granted to it by the state of Virginia, and is amply able to do and perform any act necessary to preserve its corporate existence and prosecute the business in which it is engaged. Under these circumstances it cannot be reasonably insisted that the charter or certificate of consolidation, union, and merger which was granted to it by the state of South Carolina, with full knowledge on the part of the officials of that state as to the character of the agreement by which it became the owner of the Savannah, Florida & Western Railway Company, could have the effect of destroying or in

any wise affecting the legislation of the foreign state which brought it into existence, or to deprive it of any rights which it may possess as a citizen of the state of Virginia.

It is also insisted by the plaintiffs that this court erred in permitting the defendant to amend its petition so as to allege that it was not a citizen of the state of South Carolina. We do not deem it necessary to pass upon the question as to whether the court had the power to permit this amendment, inasmuch as it is alleged in the petition that the defendant is a corporation organized in accordance with the laws of Virginia, and as such is doing business in the state of South Carolina. Such being the case, the amendment was unnecessary.

However, it is contended by the plaintiffs that it was necessary to allege in the petition that the defendant was not a citizen of the state of South Carolina. This would be true if the defendant were an individual; but inasmuch as the defendant is a corporation, and there is an allegation in the petition to the effect that the defendant is a citizen of a state other than the one in which the suit is instituted, such allegation necessarily negatives the idea that the petitioner is a citizen of a state other than the one which brought it into existence by reason of legislative enactment. As was held in the James Case, supra, there is a legal presumption that a corporation is a citizen of the state which created it. In the case of Shaw v. Quincy Mining Co., 145 U. S. 449, 12 Sup. Ct. 937, 36 L. Ed. 768, in discussing this question, the court quotes from the case of Bank of Augusta v. Earle, 13 Pet. 519, 10 L. Ed. 274, where, among other things it is said:

"It is very true that a corporation can have no legal existence out of the boundaries of the sovereignty by which it is created. It exists only in contemplation of law, and by force of the law; and where that law ceases to operate, and is no longer obligatory, the corporation can have no existence. It must dwell in the place of its creation, and cannot migrate to another sovereignty. But, although it must live and have its being in that state only, yet it does not by any means follow that its existence there will not be recognized in other places; and its residence in one state creates no insuperable objection to its power of contracting in another."

After quoting as above, Chief Justice Taney said:

"This statement has been often reaffirmed by this court, with some change of phrase, but always retaining the idea that the legal existence, the home, the domicile, the habitat, the residence, the citizenship of the corporation can only be in the state by which it was created, although it may do business in other states whose laws permit."

Thus it will be seen that, in a case wherein it is alleged that a corporation is a citizen of a state other than that in which it is sued, it would be useless to allege that it was not a citizen of the latter. Therefore it is not necessary to further discuss this branch of the case, and for the reasons herein stated the motion to remand is refused.