RAILROAD COMPANY *v.* GEORGIA.

1. A provision of the statutory code of Georgia which took effect Jan. 1, 1863, enacts that private corporations are subject to be changed, modified, or destroyed at the will of the creator, except so far as the law forbids it, and that in all cases of private charters thereafter granted, the State reserves the right to withdraw the franchise, unless such right is expressly negatived in the charter. Two railroad companies created prior to that date, each of which enjoyed by its charter a limited exemption from taxation, were consolidated by virtue of an act of the legislature passed April 18, 1863, which authorized a consolidation of their stocks, conferred upon the consolidated company full corporate powers, and continued to it the franchises, privileges, and immunities which the companies had held by their original charters. *Held,* 1. That by the consolidation the original companies were dissolved, and a new corporation was created, which became subject to that provision of the code. 2. That a subsequent legislative act, taxing the property of such new corporation as other property in the State is taxed, was not prohibited by that provision of the Constitution of the United States which declares that no State shall pass a law impairing the obligation of contracts.

2. The judgment of the highest court of a State, that a statute has been enacted in accordance with the requirements of the State Constitution, is conclusive upon this court, and it will not be reviewed.

ERROR to the Supreme Court of the State of Georgia.

This case came before the Superior Court for Fulton County, Georgia, on an " affidavit of illegality " filed by the Atlantic and Gulf Railroad Company in regard to an execution for taxes which had been issued by the comptroller-general of the State, in pursuance of an act of the General Assembly, approved Feb. 28, 1874, entitled " An Act to amend the tax laws of this State, so far as the same relate to railroad companies, and to define the liabilities of such companies to taxation, and to repeal so much of the charters of such companies, respectively, as may conflict with the provisions of this act." The affidavit averred that the company, by the original charters granted to the Savannah, Albany, and Gulf Railroad Company, and to the Atlantic and Gulf Railroad Company, or by the act consolidating them under the name of the last company, was not liable to be taxed more than one-half of one per cent on its annual net income, and that said act of Feb. 28, in so far as it authorized the levy and collection of a higher tax on its property, was in violation of the

tenth section of the first article of the Constitution of the United States, and therefore void.

The court overruled the affidavit, and gave judgment "that the execution proceed." That judgment having been affirmed by the Supreme Court of the State, the company sued out this writ of error.

The remaining facts are stated in the opinion of the court.

The case was argued by *Mr. Robert Falligant* and *Mr. W. S. Chisholm* for the plaintiff in error, and by *Mr. Robert N. Ely*, Attorney-General of Georgia, and *Mr. Robert Toombs*, for the defendant in error.

MR. JUSTICE STRONG delivered the opinion of the court.

The single question presented in this case is whether the act of the legislature of Georgia, approved Feb. 28, 1874, whereby it was enacted that the property of all railroad companies in the State should be taxed as other property of the people of the State, impairs the obligations of the contract contained in the charter of the plaintiff in error. The question compels consideration of the inquiry, what was the contract into which the State entered with the company, and what are the rights which the company holds under it.

Prior to the eighteenth day of April, 1863, there were two railroad companies in the State, one incorporated on the twenty-fifth day of December, 1847, as the "Savannah, Albany, and Gulf Railroad," and the other incorporated on the twenty-seventh day of February, 1856, with the name, "The Atlantic and Gulf Railroad Company," the same name now borne by the plaintiffs. The charter of each of these companies contained a grant of all the rights, privileges, and immunities which had been granted to, or were held and enjoyed by, any other incorporated railroad company or companies, or which had been granted to the Central Railroad and Banking Company, or to the Georgia Railroad Company, or to either of them. Both these latter companies had been incorporated prior to 1840, and each held by its charter the privilege or immunity of not being subject to be taxed higher than one-half of one per cent upon its annual net income in the one case, and in the other, on the net proceeds of its investments. Consequently,

the Savannah, Albany, and Gulf Railroad Company, and the Atlantic and Gulf Railroad Company, severally acquired by their charters an exemption from taxation at any higher rate, or in any different manner. And such an immunity they severally continued to hold down to 1863. This, we think, admits of no reasonable doubt. If their rights are now the same as they were when the original charters of the two companies were first granted, it is quite clear the provisions of the taxing act of 1874 could not be applied to them without impairment of the contracts they had with the State. Neither of the companies, however, is now existing under or by virtue of its original charter. On the eighteenth day of April, 1863, the legislature of the State passed an act whereby they were empowered to consolidate their stocks upon such terms as might be agreed upon by the directors and ratified by a majority of the stockholders; and the act enacted, that when so consolidated they should be known as " The Atlantic and Gulf Railroad Company," with a proviso that nothing therein contained should relieve or discharge either of them from any contract theretofore entered into by either, but that this company should be liable on the same. By the second section it was enacted that the stockholders of said consolidated railroad companies, by such corporate name, and in such corporate capacity, should be capable in law to have, purchase, and enjoy such real and personal estate, goods, and effects as might be necessary and proper to carry out the objects therein specified, and to secure the full enjoyment of all the rights therein and thereby granted, and by said name to sue and be sued, plead and be impleaded, in any court of competent jurisdiction; to have and use a common seal, and the same to alter at pleasure; to make and establish by-laws, and generally to exercise corporate powers.

The third section of the act declared that the several immunities, franchises, and privileges granted to the said Savannah, Albany, and Gulf Railroad Company, and the Atlantic and Gulf Railroad Company, by their original charters and the amendments thereof, and the liabilities therein imposed, should continue in force, except so far as they might be inconsistent with the act of consolidation.

The fifth section repealed all laws and parts of laws militating against the act.

It is conceded that under this act a consolidation took place. It is, therefore, a vital question, What was its effect? Did the consolidated companies become a new corporation, holding its powers and privileges as such under the act of 1863? Or was the consolidation a mere alliance between two pre-existing corporations, in which each preserved its identity and distinctive existence? Or, still further, was it an absorption of one by another, whereby the former was dissolved, while the latter continued to exist? The answer to these inquiries must be found in the intention of the legislature as expressed in the consolidating act. We think that intention was the creation of a new corporation out of the stockholders of the two previously existing companies. The consolidation provided for was clearly not a merger of one into the other, as was the case of *Central Railroad & Banking Co.* v. *Georgia*, 92 U. S. 665. Nor was it a mere alliance or confederation of the two. If it had been, each would have preserved its separate existence, as well as its corporate name. But the act authorized the consolidation of the stocks of the two companies, thus making one capital in place of two. It contemplated, therefore, that the separate capital of each company should go out of existence as the capital of that company; and, if so, how could either have a continued separate being? True, the proviso to the first section declared that nothing therein contained should relieve or discharge either of the companies from any contract theretofore entered into by either, adding: " But this company [that is, the company created by the act] shall be liable on the same." It is thus distinguished between the two original companies and the one contemplated to be formed by their consolidation. And the proviso would have been quite unnecessary, had it not been thought by the legislature that the consolidation would work a dissolution of the amalgamated companies. Hence it was considered necessary to preserve the rights of parties who might have contracted with them. Only their contracts were mentioned in the proviso, and that in order to authorize a novation. The third section continued in force the several immunities, franchises, and privileges granted by the original

charters and the amendments thereof, and the liabilities therein imposed, but plainly for the benefit of the consolidated companies. Why speak of original charters, if a later charter was not intended by the act? That such was the intention appears still more clearly in the third section. That conferred upon the consolidated stockholders complete corporate powers. It granted to them, when consolidated, not only a corporate name, but the right under that name to acquire and hold property, to sue and be sued, to have a common seal, to make by-laws, and generally to do every thing that appertains to corporations of like character. This full grant of corporate power must have been intended for some purpose. What was it, if not to create a corporation? For that purpose it was amply sufficient. For any other it was unmeaning. If the two original companies were to continue in being, if it was not contemplated that they should be dissolved by consolidation, a new grant of corporate power and existence was unnecessary. They had it already.

Looking thus at the legislative intent appearing in the consolidation act, we are constrained to the conclusion that a new corporation was created by the consolidation effected thereunder in the place and in lieu of the two companies previously existing, and that whatever franchises, immunities, or privileges it possesses, it holds them solely by virtue of the grant that act made. That generally the effect of consolidation, as distinguished from a union by merger of one company into another, is to work a dissolution of the companies consolidating, and to create a new corporation out of the elements of the former, is asserted in many cases, and it seems to be a necessary result. In *McMahan* v. *Morrison* (16 Ind. 172), the effect of a consolidation was said to be " a dissolution of the corporations previously existing, and, at the same instant, the creation of a new corporation, with property, liabilities, and stockholders derived from those then passing out of existence." So in *Lauman* v. *The Lebanon Valley Railroad Co.* (30 Pa. St. 42), the court said : " Consolidation is a surrender of the old charter by the companies, the acceptance thereof by the legislature, and the formation of a new company out of such portions of the old as enter into the new." This court, in *Clearwater* v. *Meredith*

(1 Wall. 40), expressed its approval of what was said in the former of these cases. It is true these expressions have not all the weight of authority, for they were not necessary to the decisions made, but they are worthy of consideration, and they are in accordance with what seems to be sound reason. When, as in this case, the stock of two companies is consolidated, the stockholders become partners, or *quasi* partners, in a new concern. Each set of stockholders is shorn of the power which, as a body, it had before. Its action is controlled by a power outside of itself. To illustrate : The stockholders of the Savannah and Albany Railroad Company could not, after consolidation, have exercised any of the powers or franchises they had prior to their consolidation with the stockholders of the Atlantic and Gulf Railroad Company. They could not have built their road or controlled its management. They could not, therefore, have performed the duties which by their original charter were imposed upon them. Those duties could only have been performed by another organization, composed partly of themselves and partly of others. Their powers, their franchises, and their privileges were therefore gone, no longer capable of exercise or enjoyment. Gone where ? Into the new organization, the consolidated company, which exists alone by virtue of the legislative grant, and which has all its powers, facilities, and privileges by virtue of the consolidation act. What, then, was left of the old companies ? Apparently nothing. They must have passed out of existence, and the new company must have succeeded to their rights and duties. But the new company comes into existence under a fresh g ant. Not only its being, but its powers, its franchises, and immunities, are grants of the legislature which gave it its existence.

If, then, the old Atlantic and Gulf Railroad Company and the Savannah, Albany, and Gulf Railroad Company went·out of existence when their stocks were consolidated under the act of the legislature of 1863, their powers, their rights, their franchises, privileges, and immunities ceased with them, and they have no existence except by virtue of the grant of corporate powers and privileges made by the consolidation act of 1863. That act created a new corporation, and endowed it with the several immunities, franchises, and privileges which had pre-

viously been granted to the two companies, but which they could no longer enjoy.

It necessarily follows that the new company held the rights granted to it under and subject to the law as it was when the new charter was granted. And the code of the State, which came in force on the 1st of January, 1863, before the charter was granted, contained the following provision : —

" SECT. 1051. Persons are either natural or artificial. The latter are creatures of the law, and, except so far as the law forbids it, subject to be changed, modified, or destroyed at the will of the creator ; they are called corporations."

" SECT. 1082. In all cases of private charters hereafter granted, the State reserves the right to withdraw the franchise, unless such right is expressly negatived in the charter."

No such right was negatived in the charter granted to the plaintiffs in error. Consequently the franchise was held subject to a power in the State to withdraw it, and subject to be changed, modified, or destroyed at the will of its grantor or creator. These provisions of the code became, in substance, a part of the charter. *Railroad Company* v. *Maine*, 96 U. S. 499. It is quite too narrow a definition of the word " franchise," used in this statute, to hold it as meaning only the right to be a corporation. The word is generic, covering all the rights granted by the legislature. As the greater power includes every less power which is a part of it, the right to withdraw a franchise must authorize a withdrawal of every or any right or privilege which is a part of the franchise. So it was held in *The Central Railroad & Banking Co.* v. *Georgia* (54 Ga. 401), and so it must be held now, especially in view of the statutory provision of the code, that private corporations are subject to be changed, modified, or destroyed at the will of their creator. Hence the exemption from taxation, except to the extent and in the mode designated in the charter, could be withdrawn without any violation of the State's contract with the company, and the act of 1874 was such a withdrawal.

In regard to the position taken by the plaintiff in error, that the sections of the code we have quoted were not laws of the

State in 1863, because the code was not read three times in each house of the General Assembly, as required by the State Constitution, it is sufficient to say the Supreme Court of the State has decided they were, and its decision of such a question is not open for revision by us in a case brought here from a State court. *Pennsylvania College Cases*, 13 Wall. 190.

*Judgment affirmed.*

NOTE. — *Railroad Company* v. *Georgia*, error to the Supreme Court of the State of Georgia, was argued at the same time and by the same counsel as was the preceding case. The question involved was the validity of the tax for the year 1875, which had been sustained by the court below.

MR. JUSTICE STRONG delivered the opinion of the court affirming the judgment.