## APPEALS OF A. J. SIEGEL ET AL.

Docket No. 5255.[1]   Submitted December 23, 1925.   Decided June 23, 1926.

1. Under the 1918 amendment to the National Banking Act, three banking associations agreed to unite their business and assets and to continue the business under the charter of one of such associations, in accordance with the provisions of the statute. *Held*, that no new corporate entity was created, the effect of the statute being to merge the identity of two of such associations in the third, whose corporate existence continued.

2. Under the terms of the agreement under which such merger took place, stockholders of the bank which continued its corporate existence received stock of a par value in excess of the par value of the stock held prior to such merger. *Held*, that under the Revenue Act of 1918 the amount of the excess in par value should be treated as a gain to the extent provided in section 202 (b) of that Act.

3. Where, as a result of a merger, the interests of the stockholders are substantially different from their interests prior to such merger, the transaction may result in a taxable gain, even though the corporate identity of the corporation in which the taxpayer is a stockholder continues. *Weiss* v. *Stearn*, 265 U. S. 242; *Marr* v. *United States*, 268 U. S. 536.

*George T. Weitzel, Esq.*, for the petitioners.
*Edward C. Lake, Esq.*, for the Commissioner.

Before GRAUPNER,[2] TRAMMELL, and PHILLIPS.

Taxpayers appeal from the determination of deficiencies in income tax for 1919, arising from the decision of the Commissioner that a

---

[1] The following appeals were consolidated for hearing, involve the same question, and are decided herewith: Appeals of A. J. Siegel, No. 5255; George L. Allen, No. 137; Joseph D. Bascom, No. 5260; Mississippi Valley Trust Co., Trustees, Jessie K. Lindley Trust, No. 4010; Mississippi Valley Trust Co.. Trustees. Rachel D. Cuendet Trust. No. 5259: Estate of Charles W. Whitelaw. No. 5262; Ada Johnson Forgan, No. 5388; F. O. Watts, No. 5256; Ambler F. Wilson, No. 5506; W. R. Wright, No. 378; Eugene D. Nims, No. 5257; Justina G. Catlin, No. 634; Daniel K. Catlin, No. 632; Theron E. Catlin, No. 631; Irene C. Allen, No. 624; Cora B. Boynton, No. 640; Andrew W. Johnson, No. 132; Jackson Johnson, No. 326; Clement W. Nelson, No. 5258; Florence J. Shinkle, No. 5261; and Joseph S. Calfee, No. 2286.

The Appeal of St. Louis Trust Co., Trustee for Mrs. C. O. Vaughn, No. 6189, was submitted January 26, 1926, upon the pleadings and the record in the *Appeal of A. J. Siegel*, and is decided herewith. *M. N. Fisher, Esq.*, for the Commissioner.

[2] This decision was prepared during Mr. Graupner's term of office.

taxable gain arose out of a merger or consolidation of three national banks.

## FINDINGS OF FACT.

In 1919 the taxpayer, A. J. Siegel, was the owner of 255 shares of stock of the Third National Bank in St. Louis. During that year the Third National Bank, the Mechanics-American National Bank and the St. Louis Union National Bank, all located in the City of St. Louis, Mo., entered into an agreement of consolidation in terms and figures as follows, to-wit:

This agreement, made between the Third National Bank of St. Louis and the Mechanics-American National Bank of St. Louis and the St. Louis Union National Bank, all located in the City of St. Louis, State of Missouri, and each acting pursuant to a resolution of its Board of Directors and by a majority of said Boards, pursuant to the authority given by, and in accordance with the provisions of, an Act of the Congress of the United States entitled "An Act to provide for the consolidation of national banking associations," approved on the 7th day of November, 1918, witnesseth as follows:

1. The Third National Bank of St. Louis (hereafter referred to as the Third National Bank), the Mechanics-American National Bank of St. Louis (hereafter referred to as the Mechanics Bank) and the St. Louis Union National Bank (hereafter referred to as the St. Louis Union Bank) are hereby consolidated under the charter of the said first named association as hereby modified.

2. The name of the consolidated association shall be "First National Bank in St. Louis."

3. The amount of capital stock of the consolidated association shall be ten million dollars ($10,000,000.00) divided into one hundred thousand (100,000) shares of one hundred dollars ($100.00) each, subject to the right to change the amount of said capital hereafter as is now, or shall hereafter be, authorized by law. On the date of consolidation its surplus shall be five million dollars ($5,000,000.00), and its undivided profits shall be five hundred thousand dollars ($500,000.00). Said capital, surplus and undivided profits at the date of consolidation shall then aggregate fifteen million five hundred thousand dollars ($15,500,000.00). Of this capital stock thirty-three thousand three hundred and thirty three and one-third (33,333⅓) shares shall be allotted to the then shareholders of each of said banks, being one and one-third (1⅓) shares for each share now held by them.

To create such capital, surplus and undivided profits and the special fund of two hundred fifty thousand dollars ($250,000.00) for the stockholders of the Third National Bank hereinafter provided for in paragraph 7 hereof, each of the three banks shall furnish net assets, over and above all of its liabilities of five million two hundred and fifty thousand dollars ($5,250,000.00) and additional assets in an amount sufficient to cover all state and city taxes assessed against it up to and including May 31, 1919, and all assessed and estimated federal taxes up to said date.

If the amount contributed by any of the three banks to provide for estimated federal taxes up to said date be made sufficient to pay said taxes when finally assessed and determined, any additional amount for that purpose shall be paid by the consolidated bank, in which event an equal amount shall be paid by the consolidated bank on account of the taxes of the other two banks. If the amount so contributed by any of the three banks is in excess of the

amount of said taxes so finally assessed and determined, then such excess amount shall be added to and held by the consolidated bank as a part of the trust fund provided for in paragraph 8 hereof.

4. The assets contributed by each of the banks shall, upon the effective date of the consolidation, be passed upon and be acceptable to a committee of nine (9), three (3) to be appointed by the Board of Directors of each of the banks, which committee shall examine the assets of each of the banks and select therefrom sufficient assets in excess of the total liabilities of said banks to other than stockholders to make up said sum of five million two hundred and fifty thousand dollars ($5,250,000.00) and taxes as hereinbefore provided and certify to such valuation. And the assets so selected by said committee shall constitute the assets tó be contributed by each of the three banks to the consolidated bank.

Said committee shall accept and treat all real estate owned by said banks as of its present book value and shall accept and treat the furniture and fixtures of the Mechanics Bank as of a value of one hundred thousand dollars ($100,-000.00) and shall determine the value of all other assets selected and accepted by it.

5. In the event said committee does not accept assets of any of said banks up to the required amount, then the shareholders of such bank not having sufficient assets to make good its proportion shall pay the difference in cash.

6. In the event that the committee finds assets belonging to any of the three consolidating banks in excess of the said amount to be contributed by each of them, then such excess assets, if any, shall be by such ·bank transferred and delivered to the consolidated bank, to be held by said bank in a special trust account for liquidation and distribution among the stockholders, as of the date of consolidation, of the respective banks contributing the same. The directors of the consolidated bank shall have full and absolute discretion in the liquidation and distribution of the same, and neither they nor the bank shall be in anywise liable for any act of theirs in relation thereto, except for their wilful misconduct. Such excess assets may be held for a period of six (6) months after the consolidation by the consolidated bank as a guarantee against any undisclosed liabilities of the contributing banks, and if any such liabilities are asserted within six (6) months after the consolidation, said excess assets, or such part thereof as the directors of the consolidated bank shall deem advisable, shall be held by the consolidated bank until such liabilities are discharged, and said assets may be used in the absolute discretion of the directors of the consolidated bank to liquidate and discharge any such liabilities.

7. Out of the assets aggregating fifteen million seven hundred and fifty thousand dollars ($15,750,000.00) and taxes as aforesaid, contributed by the three banks, fifteen million five hundred thousand dollars ($15,500,000.00) shall constitute the capital, surplus and undivided profits of the consolidated bank, and the remaining two hundred and fifty thousand dollars ($250,000.00) which amount represents the agreed excess value of the business of the Third National Bank over the business of each of the other banks, shall be set aside and held by the consolidated bank as a special fund for the account of the stockholders of record of the Third National Bank on the date of the consolidation and as a guarantee against loss on the real estate of the Third National Bank upon the following conditions, to wit:

If the real estate now owned by the Third National Bank is occupied as the permanent place of business ·of the consolidated bank, under resolution of its Board of Directors, then, when so occupied, said sum shall be distributed among the persons, or their legal representatives, who were stockholders of the Third National Bank on the date of the consolidation.

If said real estate be sold prior to July 1, 1922, at its present book value, then said sum shall likewise be so distributed when said real estate is sold. If said real estate is sold prior to said date for less than its present book value, then the difference between the sale price and said book value shall be deducted from said sum and shall become the property of the consolidated bank, and the remainder only, if any, of said sum shall be so distributed to said stockholders.

If said real estate is not so occupied by the consolidated bank and is not sold prior to July 1, 1922, then said sum shall become the property of the consolidated bank.

8. The Board of Directors of the consolidated bank shall be not less than five (5) nor more than fifty-five (55) in number.

These directors shall continue in office until new directors are elected and qualify. The stockholders shall, at each annual meeting, have the right to determine the number of directors to be elected for the ensuing year, and, in the absence of any change, the same number of directors shall be elected as were elected the preceding year.

9. The above mentioned Board of Directors shall meet at the office of the above-mentioned consolidated bank on July 7, 1919, at the hour of 10 o'clock a. m., for the purpose of electing officers of the consolidated bank, adopting by-laws and transacting such other business as may come before said meeting. These officers shall serve until their successors shall have been chosen and qualified.

If such consolidation has not become effective on July 7, 1919, then such first meeting of the Board of Directors shall be held at the hour of 10 o'clock a. m. on the effective date of such consolidation.

10. On July 5, 1919, or on the date the consolidation takes effect, each of the stockholders of the three banks shall, on delivery of his certificates of stock in the consolidating banks, duly endorsed for cancellation, receive, on demand, on or after the day succeeding the effective date of consolidation, one and one-third (1⅓) shares of stock in the consolidated bank for each share of the stock formerly owned by him in the respective consolidating banks.

11. The consolidation herein provided for shall become effective as of the close of business on July 5, 1919, if the consolidation shall then have been ratified and confirmed by the affirmative vote of the shareholders of each of the said three banks holding at least two-thirds (⅔) of their capital stock outstanding, at meetings to be called and held as provided in the National Banking Act, and shall have been approved by the Comptroller of the Currency of the United States. And if not so ratified and approved on or before said July 5, 1919, then the consolidation shall become effective when so ratified and approved.

Witness the signature and seals of said associations, this ———— day of ————, 1919, each hereunto set by the president and attested by its cashier, pursuant to a resolution of its Board of Directors, acting by a majority thereof, and witness the signatures hereto of a majority of each of said Board of Directors.

At the time of the execution of this contract between the three banks, the capital stock of the Third National Bank was $2,000,000, the surplus $2,000,000 and the undivided profits $350,000, or a total of assets of $4,350,000. It was therefore necessary, in order for the Third National Bank to be able to contribute its $5,250,000 of assets

contemplated by the agreement of consolidation, that its assets be increased by the sum of $1,000,000. In order to produce this additional $1,000,000, the capital stock of the Third National Bank was increased $500,000 and the additional shares of stock were offered and sold to the then existing stockholders of the Third National Bank at the price of $200 per share. There was thus added $500,000 to the capital and $500,000 to the surplus of the Third National Bank. At the time of this increase, each then shareholder of the Third National Bank was allowed to subscribe for one share of the new stock for each four shares of stock then held. The capital stock of the Third National Bank was so increased, and certificate of such increase was issued on June 28, 1919.

The capital and surplus of the Third National Bank having, in this manner, been increased and the capital and surplus of the Mechanics-American National Bank having, in like manner, been increased, thereafter, in pursuance of the agreement of consolidation above set out, the name of the Third National Bank was changed to First National Bank in St. Louis and the business of the three banks was continued under the charter of the Third National Bank. Meetings of the stockholders of the three banks were held and the agreement of consolidation approved, which consolidation became effective as of July 5, 1919, and certificate was issued by the Comptroller of the Currency on July 7, 1919, approving the consolidation.

In carrying out the consolidation and in pursuance of the provisions of paragraph 4 of the contract of consolidation, a committee of nine was appointed, which committee examined the assets proposed to be contributed by each of the three banks, and such of the assets of the three banks as were in excess of the amount of $5,250,000 to be contributed by each of them were, by each of such banks, delivered to the consolidated bank to be held, and they have since been held, as a special trust fund to be liquidated and distributed among the stockholders as of the date of consolidation. The committee selected assets of each bank of a value of $5,250,000, which were accepted under the agreement as the contribution of each bank, as provided in the contract. There was no other or further division or separation of any portion of the assets of any of the three banks from any other portion of its assets for distribution among the stockholders except for the distribution, through the consolidated bank, of the assets of any of the consolidated banks in excess of $5,250,000.

The certificate of the Comptroller of the Currency approving the consolidation was issued on July 7, 1919, in terms as follows:

Whereas, by satisfactory evidence presented to the undersigned, it has been made to appear that the directors and shareholders of the Third National Bank of St. Louis, Missouri, The Mechanics-American National Bank of St.

Louis, Missouri, and The St. Louis Union National Bank, St. Louis, Missouri, have complied with all the provisions of an Act of Congress approved November 7, 1918, entitled "An Act to provide for the consolidation of National Banking Associations."

Now, therefore, I, Thomas P. Kane, Acting Comptroller of the Currency, do hereby certify that the Third National Bank of St. Louis, The Mechanics-American National Bank of St. Louis, and the St. Louis Union National Bank have been consolidated under the charter of the Third National Bank of St. Louis and under the corporate title of "First National Bank in St. Louis," with capital stock of ten million dollars ($10,000,000), and that the said consolidation is approved.

In testimony whereof witness my hand and seal of office this seventh day of July, 1919.

(Signed)        T. P. KANE,
*Acting Comptroller of the Currency.*

Charter No. 170.    Consolidation No. 16.

Charter No. 170 is the charter number of the First National Bank in St. Louis and is the same charter number held by the Third National Bank of St. Louis.

After the certificate of consolidation had been issued, each former stockholder of the Third National Bank, and of the Mechanics-American National Bank, and the St. Louis Union National Bank, received one and one-third shares of stock of the consolidated bank for each share formerly held.

None of the taxpayers reported any gain or loss from the transaction. The number of shares of stock in each of these banks held by each of the taxpayers, the amount of the gain as determined by the Commissioner and the deficiencies in income tax for 1919 determined by him are as follows:

| Taxpayer. | No. of shares of stock owned. | Gain determined. | Deficiency. |
|---|---|---|---|
| A. J. Siegel | 255 Third National Bank | $8, 500. 00 | $2, 509. 84 |
| George L. Allen | 125 Third National Bank | 4, 375. 00 | 2, 572. 73 |
| Joseph D. Bascom | ____do | 4, 166. 67 | 1, 693. 69 |
| Mississippi Valley Trust Co., trustee, Jessie K. Lindley trust. | 180 Third National Bank | 6, 000. 00 | 250. 00 |
| Mississippi Valley Trust Co., trustee, Rachel D. Cuendet trust. | 100 Third National Bank | 2, 400. 00 | 56. 00 |
| Estate of Charles W. Whitelaw. | 96¼ Third National Bank | 3, 208. 33 | 184. 12 |
| Ambler F. Wilson | 125 Third National Bank | 4, 166. 67 | . 484. 14 |
| W. R. Wright | 215 Third National Bank | 7, 166. 67 | 1, 121. 88 |
| Eugene D. Nims | 126½ Third National Bank | 5, 416. 67 | 1, 322. 70 |
| F. O. Watts | 1236⅓ Third National Bank<br>125 Mechanics American National Bank. | 45, 375. 00 | 19, 339. 18 |
| Ada Johnson Forgan | 156¼ Third National Bank | 5, 208. 33 | 600. 90 |
| Joseph S. Calfee | 315 Third National Bank | 10, 395. 00 | 2, 208. 09 |
| Justina G. Catlin | ½ interest in 125 shares Mechanics American National Bank. | 3, 225. 00 | 1, 146. 40 |

| Taxpayer. | No. of shares of stock owned. | Gain determined. | Deficiency. |
|---|---|---|---|
| Daniel K. Catlin | ⅙ interest in same | $1, 075. 00 | $322. 50 |
| Theron E. Catlin | do | 1, 075. 00 | 306. 36 |
| Irene C. Allen | do | 1, 075. 00 | 446. 19 |
| Cora B. Boynton | 125 Mechanics American National Bank. | 4, 166. 67 | 842. 33 |
| Andrew W. Johnson | 125 do | 5, 000. 00 | 1, 410. 45 |
| Jackson Johnson | 462½ Mechanics American National Bank. | 16, 261. 50 | 7, 522. 95 |
| Clement W. Nelson | 125 Mechanics American National Bank. | 4, 166. 67 | 644. 91 |
| Florence J. Shinkle | 156¼ Mechanics American National Bank. | 5, 208. 33 | 752. 57 |
| St. Louis Trust Co., trustee for Mrs. C. O. Vaughn. | 140 Mechanics American National Bank. 147½ Third National Bank. | 9, 583. 33 | 1, 644. 12 |

OPINION.

Phillips : The sole question involved is whether any taxable gain resulted from the transaction set out in the findings. There are no differences between the parties as to the correctness of the computation of the gain, if any taxable gain resulted.

The appeal arises out of the same transaction which was involved in *Appeal of R. D. Musser*, 2 B. T. A. 1031. Counsel for the taxpayers contends that the Board erred in that case when it reached the conclusion that a new corporation was created. Counsel takes the position that the opinion (1) does not give weight to the provisions of the statute which provide that the consolidation is to take place under the charter of one of the existing banks, (2) relies upon decisions interpreting the National Banking Act which were rendered under other provisions of the Act and not under the provisions of the 1918 amendment, which amendment was passed for the purpose of changing the law under which the decisions referred to were made, and (3) does not give consideration to those provisions of the National Banking Act which provide that no new corporation shall engage in banking without first having procured from the Comptroller of the Currency a certificate authorizing the bank to commence business and which prohibit payment for stock in property.

After reciting provisions of the agreement and quoting the Act, the opinion of the Board in the *Musser* appeal quotes 7 Corpus Juris, 851, to the effect that the National Banking Act has been construed as authorizing the consolidation of national banks and as stating further that where consolidation is effected by one bank taking over all the assets and assuming all the liabilities of the other, the former becomes a new corporation whose stockholders are the stockholders of each of the old corporations before consolidation. For this proposition Corpus Juris cites *Bonnet* v. *First National Bank of Eagle*

*Pass*, 60 S. W. 325, decided by the Court of Civil Appeals of Texas in 1900.

That was an action in which a stockholder sought to recover damages for the action of the corporation in depriving him of his right to acquire his quota of newly issued shares of stock, such stock having been issued to the stockholders of another bank whose assets had been taken and liabilities assumed by the defendant under authority of the National Banking Act then in force. The principal question was whether there had been a mere purchase of the assets of the bank whose assets were taken. The court, just prior to the extract from the opinion which is set out in the *Musser* appeal, asks: "Was the consolidation (for it is treated by appellant as a consolidation) or amalgamation of the banks *ultra vires*, and therefore void?" It appears that the court had itself some doubt whether there was a consolidation or amalgamation (merger) but in its opinion it followed the theory of the appellant. Whether there was a consolidation or a merger, the result would be the same, and while the opinion contains a statement concerning the effect of a consolidation, and a further statement that, in effect, a new corporation existed, it can not be considered authority for the proposition that a consolidation, rather than a merger, resulted, or that a new legal entity came into being. We must also bear in mind that the consolidation or merger in that case did not take place under the provisions of the law which is here involved.

The opinion in *Bonnet* v. *First National Bank of Eagle Pass* relies upon *Adams* v. *Yazoo & M. V. R. R. Co.*, 77 Miss. 194; 24 So. 200 (which was subsequently appealed to the United States Supreme Court and is discussed below) and upon *Railway Co.* v. *Ashling*, 160 Ill. 373; 43 N. E. 373. The question involved in the latter case was whether an award of damages for personal injuries against one corporation could be recovered from a successor corporation. The decision does not differentiate between a merger and a consolidation, nor was it necessary in that case to do so. During the course of its opinion the court says:

The general rule that the consolidation of two or more corporations into one creates a new company, and works a dissolution of the original corporations forming the consolidated company, is subject to exceptions, and depends upon the statute under which the consolidation is effected. * * *

We see no reason why, under the statutes in question, one corporation may not be consolidated with another, under the name of such other, which is continued in existence with enlarged powers, franchises, and property rights. It is, in substance, so provided, and such consolidations are frequently made.

The court then proceeds to determine that one of the " consolidated " companies remained in existence. Surely this case can not be cited as authority for the proposition that in all consolidations

each of the consolidating companies goes out of existence and a new legal entity comes into existence.

This case was discussed in *Collinsville National Bank* v. *Esau*, 74 Okla. 45; 176 Pac. 514, where the court said:

A "consolidation" takes place where two or more existing corporations are united into a single corporation, and the existence of the uniting corporation is terminated, and the organization succeeds in a general way to the franchise and acquires the property and assets and assumes the debts and obligations of the constituent companies.

In ordinary legal phraseology, the term "consolidation" is generally used to indicate the act and result of uniting two or more corporations into one under a new name. A "merger" takes place where one of the constituent corporations remains in existence absorbing or merging in itself all the other companies. In a merger of two or more companies, one of the merging corporations continues to survive and succeeds to the franchise and acquires the property and assets of the other constituent corporations; that is, the merger consists from the uniting of two or more corporations by the transfer of the property to some one of the existing corporations, which continues its existence while the others are swallowed up or consumed by the one that survives. It differs from a "consolidation" wherein all the corporations cease to exist and unite in the interest of a new one. Rightly understood, there never can be a consolidation of corporations except where the constituent corporations cease to exist as separate entities, and a new corporation with the property and assets of the old one comes into being. Thus it will be seen that a "merger" is not the equivalent of a "consolidation" at all. Whether a particular transaction is in reality a sale, conversion, consolidation, or merger, to a great extent depends on the circumstances surrounding each particular case.

In the case of *C., S. F. & Cal. Ry. Co.* v. *Ashling*, 160 Ill. 373, 43 N. E. 373, it is held that, where one corporation takes over all of the property and assets and succeeds to the franchise of another corporation and issues stock in the new corporation to the stockholders of the old corporation in exchange for an equal amount held by them in the old company, and the officers of the old corporation are made officers in the new, it amounted to a consolidation of the two entities. While we do not agree with the Illinois court that such transaction amounted to a consolidation, nevertheless we do believe it was a merger, and the same conclusion and result must follow as to the rights of creditors of the old corporation to assert their claims against the new organization.

The opinion in the *Musser* appeal then goes on to say that the legal effect of a consolidation is to extinguish the constituent companies and create a new corporation with appropriate liabilities and stockholders derived from those then passing out of existence, and cites *Adams* v. *Yazoo & M. V. R. R. Co.*, *supra*. That case was subsequently appealed to the Supreme Court of the United States and is reported as *Yazoo & M. V. Ry. Co.* v. *Adams*, 180 U. S. 1. In that case the statute under which the companies were consolidated provided:

All of the companies so consolidating shall be merged into and become one company, and the companies so formed by such consolidation shall be deemed and held to be a corporation created by the laws of this State.

The Supreme Court held that under the statute there was a grant of corporate power creating a new corporation, and affirmed the decision of the Supreme Court of Mississippi holding that a new corporation was created. In the course of its opinion the Supreme Court says:

But if, as was the case in *Tomlinson* v. *Branch* [15 Wall. 460], one road loses its identity and is merged in another, the latter preserving its identity, and issuing new stock in favor of the stockholders of the former, it is not the creation of a new corporation but an enlargement of the old one. In such case it was held that where the company which had preserved its identity held as to its own property a perpetual exemption from taxation, it would not be extended to the property of the merged company without express words to that effect.

   *       *       *       *       *       *

In *Central Railroad & Banking Company* v. *Georgia*, 92 U. S. 665, 670, an act of the legislature authorized the Central Railroad and the Macon Railroad to *unite and consolidate their stock*, and all their rights, privileges, immunities and franchises, under the name and charter of the Central Railroad, in such manner that each owner of shares of stock of the Macon Road should be entitled to receive an equal number of shares of the stock of the consolidated companies. "Whether," said Mr. Justice Strong, "such be the effect [consolidation or amalgamation] or not, must depend upon the statute under which the consolidation takes place, and of the intention therein manifested. If, in the statute, there be no words of grant of corporate powers, it is difficult to see how a new corporation is created." It was held that the act did not work a dissolution of the existing corporations and the creation of a new company, since there was no provision for a surrender of the stock of the shareholders of the Central, and none for the issue of other certificates to them. In that case, the road, whose charter contained the exemption from taxation, was preserved intact by the consolidation, and it was held that its exemption continued, while the other road was to go out of existence. * * *

Other cases to the same effect, holding that the consolidation did not operate as a dissolution of the constituent companies, are *Chesapeake & Ohio Railroad* v. *Virginia*, 94 U. S. 718; *Greene County* v. *Conness*, 109 U. S. 104, and *Tennessee* v. *Whitworth*, 117 U. S. 139.

* * * In *Railroad Company* v. *Georgia*, 98 U. S. 359, two railroad companies were consolidated by an act of the legislature, which authorized the consolidation of their stocks, *conferred upon the consolidated company full corporate powers*, and continued to it the franchises, privileges and immunities which the companies had held by their original charters. We held in that case that a new corporation was created, which became subject to the provisions of a statutory code, adopted January 1, 1863, permitting the charters of private corporations to be changed, modified or destroyed at the will of the legislature. The case was distinguished from *Railroad Company* v. *Georgia*, 92 U. S. 665, as being a consolidation instead of a merger. "Nor was it," said Mr. Justice Strong, "a mere alliance or confederation of the two. If it had been, each would have preserved its separate existence as well as its corporate name; but the act authorized the consolidation of the stocks of the two companies, thus making them one company in place of two. It contemplated, therefore, that the separate capital of each company should go out of existence as the capital of that company." To the same effect is *St. Louis, Iron Mountain &c. Railway* v. *Berry*, 113 U. S. 465. (Italics ours.)

The distinction between a consolidation and a merger has been laid down in a number of cases in addition to those quoted above.

In *State* v. *Atlantic Coast Line R. R. Co.*, 202 Ala. 558; 81 So. 60, the court says:

Accurate logicians very properly distinguish between the meanings of "consolidation" and "merger." Strictly speaking, a consolidation means the unifying of two or more corporations into a *single new corporation*, having the combined capital, franchises, and powers of all of its constituents. And, strictly speaking, a merger means the *absorption* of one corporation by another, which retains its name and corporate identity, with the added capital, franchises, and powers of the merged corporation. * * * For most purposes, however, and apart from mere questions of identity, the result is in each case practically the same; and so it is that courts and text-writers have usually used the terms "consolidation" and "merger" interchangeably, and, in cases of doubt, conjunctively, to express the idea of complete corporate union, whether a new corporation nominally results or whether a constituent corporation is nominally preserved.

To the same effect, see *Alabama, T. & N. Railway* v. *Tolman*, 200 Ala. 449; 76 So. 381; and *Chicago Title & Trust Co.* v. *Doyle*, 259 Ill. 489; 102 N. E. 790.

In *Keokuk & Western R. R. Co.* v. *Missouri*, 152 U. S. 301, the court said:

In the numerous cases which have arisen in this court as to the effect of a consolidation upon the existence and status of the constituent corporations, it has been held that the question of the dissolution of such corporations depended upon the language of the statute under which the consolidation took place.

In *Chicago Title & Trust Co.* v. *Doyle, supra*, the court said:

The question of the effect of the consolidation must be answered by a consideration of the terms of the statute under which the consolidation took place, and not what the parties resolved or did not resolve as to such effect.

In *Central Railroad and Banking Co.* v. *Georgia*, 92 U. S. 665, the act in question provided:

Be it enacted by the general assembly of the State of Georgia, that the Macon and Western Railroad Company, and the Central Railroad and Banking Company of Georgia, be, and they are hereby, authorized and empowered to unite and consolidate the stocks of the said two companies, and all the rights, privileges, immunities, property, and franchises belonging or attaching to said companies, under the name and charter of the said "The Central Railroad and Banking Company of Georgia," in such manner that each and every owner and holder of shares of the capital stock of the Macon and Western Railroad Company shall be entitled to and receive an equal number of shares of the capital stock of the consolidated companies: *Provided*, that nothing herein contained shall relieve or discharge either of said companies from any contract heretofore entered into, but that all such contracts shall be assumed by, and be binding on, the Central Railroad and Banking Company of Georgia, and all benefits and rights under the same shall accrue to, and vest in, the

said last-mentioned company: *And provided further*, that, upon such union and consolidation, the capital stock of the Central Railroad and Banking Com-r̄ny of Georgia shall not exceed the amount of the authorized capital thereof, and the present authorized capital of the Macon and Western Railroad Company added thereto.

\*          \*          \*          \*          \*          \*          \*

Be it further enacted, that upon the union and consolidation herein provided for, each stockholder in the Macon and Western Railroad Company shall be entitled to receive a certificate of stock as a shareholder in the Central Railroad and Banking Company of Georgia for a like number of shares, upon the surrender of his certificate of stock in the former company, which new certificate shall entitle the holder thereof to the same rights, privileges, and benefits as attach to the holders of stock now held by the shareholders in said companies, or either of them.

The question involved was whether certain exemptions contained in the charter of the Central Railroad and Banking Co. survived.

The court, in the course of its opinion, says:

It may be that the consolidation of two corporations, or amalgamation, as it is called in England, if full and complete, may work a dissolution of them both, and its effect may be the creation of a new corporation. Whether such be the effect or not must depend upon the statute under which the consolidation takes place, and of the intention therein manifested. If, in the statute, there be no words of grant of corporate powers, it is difficult to see how a new corporation is created. If it is, it must be by implication; and it is an unbending rule that a grant of corporate existence is never implied. In the construction of a statute, every presumption is against it. \* \* \* We are not called upon, however, now to determine whether a consolidation, effected under a statute making no express grant of new corporate existence, may not, in some cases, work a dissolution of the existing corporations, and at the same time the creation of a new company; for, in the present case, we think the act of 1872 plainly contemplated no such thing. It is true, the act speaks of union and consolidation. It authorizes the two companies to unite and consolidate their stock, and all their rights, privileges, immunities, property, and franchises; but it prescribes the manner in which this may be done, and its effect. It is to be done under the name and charter of the Central Railroad and Banking Company; that is, the union is to be under that charter, not under a new charter of a company bearing that name. The union is also to be in such a manner that every holder of the shares of the capital stock of the Macon and Western Railroad Company shall be entitled to, and shall, on the surrender of their certificates, receive, an equal number of shares of the capital stock, as a shareholder in the Central Railroad and Banking Company of Georgia, as declared in the fourth section. But there is no provision for a surrender of the certificates of stock of the shareholders of the Central, and none for the issue of other certificates to them. Their rights, whatever they may be after the union, are evidenced only by certificates of stock of the company chartered in 1835. If that charter has gone out of existence, they are stockholders in no company. Again: the act declared that all contracts of either of the companies should be assumed by and binding on the Central Railroad and Banking Company, and all benefits and rights under the same—that is, under the contracts—should vest in that company, not in a new corporation then springing into life. Nowhere in the act is there an intimation

of any legislative purpose that the Central Railroad Company should cease to exist. The Macon and Western Railroad Company was undoubtedly intended to go out of existence; for provision was made for the surrender of all the shares of its capital stock; and without stockholders it could not exist. The existence of such a provision in regard to the one company, and its absence in regard to the other, is a strong argument in support of the conclusion that it was not intended the Central Railroad and Banking Company should surrender its charter, or dissolve. And still more, that company was authorized to increase its capital, plainly for the purpose of making room for the new shareholders entitled to come in by virtue of their ownership of shares of the dissolved company's stock. The language of this provision is significant. It is, that, upon the union and consolidation, the capital stock of the Central Railroad and Banking Company "shall not exceed the amount of the *authorized capital thereof*, and the present authorized capital of the Macon and Western Railroad Company added thereto." This refers plainly to the corporation which it was contemplated should exist after the union and consolidation of the two companies. What, then, was intended by the expression "authorized capital thereof;" that is, authorized capital of the Central Company? Had this reference to a new company? Certainly not; for no new company had any authorized capital. It must have referred, therefore, to the old Central Railroad and Banking Company, in existence when the act was passed; and that was the company the amount of whose stock was to be limited after the union had taken place. That company was to continue in existence, and its capital was restricted to the amount of what had been previously authorized, augmented by a sum equal to the capital of the absorbed company.   *   *   *

*   *   * It is of no importance to the inquiry,   *   *   *   that the Central acquired under the act new and enlarged powers as well as new stockholders. It was authorized to own and operate a railroad from Macon to Atlanta; to operate it as its own. It was also authorized to increase its capital stock. But the gift of new powers to a corporation has never been thought to destroy its identity, much less to change it into a new being.   *   *   *

Our opinion, therefore, is, that the charter granted to the Central Railroad and Banking Company of Georgia, by the act of 1835, was not surrendered by its action under the later act of 1872; that it still has all the rights that were originally conferred upon it, holding them under the charter originally granted to it; and, consequently, that it is not in the power of the legislature to impose upon it a greater tax than one-half of one per centum of its net annual income.

*          *          *          *          *          *          *

*   *   * The obvious purpose of the act was to vest in the Central Company the rights, privileges, immunities, property, and franchises which had belonged to the Macon and Western Company; not to enlarge those rights, or to bestow new immunities. If, therefore, the Macon and Western held its franchises and property subject to taxation, the Central, succeeding to the franchises and property, holds them alike subject. It took them just as they were, acquiring no additional or enlarged rights as against the State.

In *Railroad Co.* v. *Georgia*, 98 U. S. 359, it appeared that in April, 1863, the legislature of the State of Georgia passed an act whereby two railroad companies were empowered to consolidate their stocks upon such terms as might be agreed upon by the directors and ratified by a majority of the stockholders; and the act provided that, when so consolidated, they should be known as "The Atlantic and

Gulf Railroad Company," with a proviso that nothing therein contained should relieve or discharge either of them from any contract theretofore entered into by either, but that this company should be liable on the same. By the second section it was enacted that the stockholders of said consolidated railroad companies, by such corporate name, and in such corporate capacity, should be capable in law to have, purchase, and enjoy such real and personal estate, goods, and effects as might be necessary and proper to carry out the objects therein specified, and to secure the full enjoyment of all the rights therein and thereby granted, and by said name to sue and be sued, plead and be impleaded, in any court of competent jurisdiction; to have and use a common seal, and the same to alter at pleasure; to make and establish by-laws, and generally to exercise corporate powers.

The third section of the act declared that the several immunities, franchises, and privileges granted to the said Savannah, Albany and Gulf Railroad Company, and the Atlantic and Gulf Railroad Company, by their original charters and the amendments thereof, and the liabilities therein imposed, should continue in force, except so far as they might be inconsistent with the act of consolidation.

The court said:

It is conceded that under this act a consolidation took place. It is, therefore, a vital question, What was its effect? Did the consolidated companies become a new corporation, holding its powers and privileges as such under the act of 1863? Or was the consolidation a mere alliance between two pre-existing corporations, in which each preserved its identity and distinctive existence? Or, still further, was it an absorption of one by another, whereby the former was dissolved, while the latter continued to exist? The answer to these inquiries must be found in the intention of the legislature as expressed in the consolidating act. We think that intention was the creation of a new corporation out of the stockholders of the two previously existing companies. The consolidation provided for was clearly not a merger of one into the other, as was the case of *Central Railroad & Banking Co.* v. *Georgia*, 92 U. S. 665. Nor was it a mere alliance or confederation of the two. If it had been, each would have preserved its separate existence, as well as its corporate name. But the act authorized the consolidation of the stocks of the two companies, thus making one capital in place of two. It contemplated, therefore, that the separate capital of each company should go out of existence as the capital of that company; and, if so, how could either have a continued separate being? True, the proviso to the first section declared that nothing therein contained should relieve or discharge either of the companies from any contract theretofore entered into by either, adding: "But this company [that is, the company created by the act] shall be liable on the same." It is thus distinguished between the two original companies and the one contemplated to be formed by their consolidation. And the proviso would have been quite unnecessary, had it not been thought by the legislature that the consolidation would work a dissolution of the amalgamated companies. Hence it was considered necessary to preserve the rights of parties who might have contracted with them.

Only their contracts were mentioned in the proviso, and that in order to authorize a novation. The third section continued in force the several immunities, franchises, and privileges granted by the original charters and the amendments thereof, and the liabilities therein imposed, but plainly for the benefit of the consolidated companies. Why speak of original charters, if a later charter was not intended by the act? That such was the intention appears still more clearly in the third section. That conferred upon the consolidated stockholders complete corporate powers. It granted to them, when consolidated, not only a corporate name, but the right under that name to acquire and hold property, to sue and be sued, to have a common seal, to make by-laws, and generally to do every thing that appertains to corporations of like character. This full grant of corporate power must have been intended for some purpose. What was it, if not to create a corporation? For that purpose it was amply sufficient. For any other it was unmeaning. If the two original companies were to continue in being, if it was not contemplated that they should be dissolved by consolidation, a new grant of corporate power and existence was unnecessary. They had it already.

Looking thus at the legislative intent appearing in the consolidation act, we are constrained to the conclusion that a new corporation was created by the consolidation effected thereunder in the place and in lieu of the two companies previously existing, and that whatever franchises, immunities, or privileges it possesses, it holds them solely by virtue of the grant that act made. That generally the effect of consolidation, as distinguished from a union by merger of one company into another, is to work a dissolution of the companies consolidating, and to create a new corporation out of the elements of the former, is asserted in many cases, and it seems to be a necessary result.

These are the two leading cases upon the subject: When does a corporate charter continue in existence? In the one it was held that the act of consolidation worked a merger under which one of the corporations continued its existence with the additional rights, privileges, franchises, and liabilities of the merging corporation. In the other it is found that a new corporation came into existence. Under which of these two cases does the present situation fall?

The act which we must consider, which is set out in full in the opinion in the *Musser* appeal, provides that any two or more national banking associations may consolidate into one *under the charter of either existing bank*, on terms to be agreed upon, subject to certain limitations. Section 2 provides that *associations consolidating with another association* shall not be required to deposit money for their outstanding circulation, but that their assets and liabilities shall be reported by the *association with which* they have consolidated, and further provides that all property rights of the *national bank so consolidated* shall be deemed transferred to *the bank into which* it is consolidated. There is here the plain expression of an intention that one or more existing corporations shall be merged into another existing corporation under the charter of the latter, which is to acquire the assets and assume the liabilities of the former. The statute uses the word " consolidate " and not " merge ", but this was

likewise true in the case of *Central Railroad & Banking Co.* v. *Georgia, supra*, and most, if not all, of the other cases cited above.

It will also be noted that nowhere in the statute is there any grant of corporate power to any new corporation, one of the principal distinctions drawn by the Supreme Court between the cases of *Central Railroad & Banking Co.* v. *Georgia, supra*, and *Railroad Co.* v. *Georgia, supra*. In our opinion the present situation falls squarely within the decision of the Supreme Court in the first of these cases. We must conclude that the Mechanics-American and St. Louis Union National banks were merged into The Third National Bank, the corporate existence of which continued under its new name.

But it does not follow, because the corporation which merged was the same legal entity as the corporation in which taxpayer held stock before the merger, that no taxable gain results. Section 202 (b) of the Revenue Act of 1918 provides as follows:

When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any; but when in connection with the reorganization, merger, or consolidation of a corporation a person receives in place of stock or securities owned by him new stock or securities of no greater aggregate par or face value, no gain or loss shall be deemed to occur from the exchange, and the new stock or securities received shall be treated as taking the place of the stock, securities, or property exchanged.

When in the case of any such reorganization, merger, or consolidation the aggregate par or face value of the new stock or securities received is in excess of the aggregate par or face value of the stock or securities exchanged, a like amount in par or face value of the new stock or securities received shall be treated as taking the place of the stock or securities exchanged, and the amount of the excess in par or face value shall be treated as a gain to the extent that the fair market value of the new stock or securities is greater than the cost (or if acquired prior to March 1, 1913, the fair market value as of that date) of the stock or securities exchanged.

Under the statute the same result follows a merger as follows a consolidation, and it remains only to determine whether there was an exchange of property for other property so that a taxable gain resulted.

It is contended that, since the corporate identity is preserved, the new stock is the equivalent of a stock dividend and is not subject to tax under the decision of the Supreme Court in *Eisner* v. *Macomber*, 252 U. S. 189. On first impression this reasoning appears sound. However, an examination of the decisions dealing with the effect of mergers convinces us that the transaction differs from a stock dividend, both in legal theory and in substance.

Under the agreement the taxpayer received 340 shares of stock in place of 255 shares previously owned. The shares received and the shares surrendered evidenced interests in different properties.

Instead of owning 255/25,000ths, he now owns 340/100,000ths, or 85/25,000ths, reducing his pro rata voting interest from approximately 1 per cent to approximately one-third of 1 per cent. This is not the result which follows a stock dividend.

It is said that the increase in the property of the corporation and the decrease in the pro rata holdings arise from what is, in effect, a purchase of additional property for stock, and that an increase in the assets of a corporation is not a transaction which subjects the stockholders to tax. The effect of the merger is more than a purchase of assets. The assets are not taken as they would be by a purchaser for value, but are subject to all infirmities in title and all liabilities of the merging corporation, whether or not made known to the corporation which acquires these assets. *People's National Bank* v. *Board*, 103 Pac. 682; *Collinsville National Bank* v. *Esau*, 74 Okla. 45; 176 Pac. 514. The stockholder has no right to subscribe for the additional shares to be issued, as would ordinarily be the case, but, on the other hand, a stockholder who does not consent to the merger has the right to have his stock appraised and to receive its value in cash. None of these results follows from the purchase of assets or from the declaration of a stock dividend. They follow from the fact that, while in legal contemplation the corporation continues its existence, it has, in effect, taken a step not authorized by its charter whereby its stock, stockholders, assets, liabilities, and powers are enlarged. When it emerges, the rights of the original stockholders have been changed in material respects and it is because this is so that a taxable transaction results.

The two most recent decisions of the Supreme Court which appear to have a bearing upon the case are *Weiss* v. *Stearn*, 265 U. S. 242, and *Marr* v. *United States*, 268 U. S. 536. Both of these arose out of reorganizations by which the assets of a corporation were transferred intact to a new corporation. In *Weiss* v. *Stearn*, it was held that no taxable transaction took place. In the course of its opinion the court says:

We cannot conclude that mere change for purposes of reorganization in the technical ownership of an enterprise, under circumstances like those here disclosed, followed by issuance of new certificates, constitutes gain separated from the original capital interest. Something more is necessary—something which gives the stockholder a thing really different from what he theretofore had.

In *Marr* v. *United States*, the court, holding that a taxable transaction resulted from the reorganization under consideration, said:

In *Weiss* v. *Stearn*, as in *Eisner* v. *Macomber*, the transaction was considered, in essence, an exchange of certificates representing the same interest, not an exchange of interests.

In the case at bar the new corporation is essentially different from the old.

Considering these two decisions, it appears that the determining point is not whether the corporate existence continues, but whether the interest of the stockholder changes. In the instant case the interests of the stockholder before the merger and after the merger differed more radically than did the interests of the stockholders in *Marr* v. *United States.* What the taxpayer now has is essentially different from that which he had and an exchange has taken place which is properly subject to tax.

> *The deficiencies are redetermined to be the amounts determined by the Commissioner, which amounts are set forth in the findings of fact above. Orders of redetermination will be entered accordingly.*